UNITED STATES of America, Appellee,

v.

**EIGHTY–EIGHT THOUSAND, FIVE HUNDRED DOLLARS,**

**Appeal of Robert B. QUINLAN.**

**No. 81–1750.**

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 14, 1982.

Decided Feb. 22, 1982.

Sandy Cortopassi, argued, London, Greenberg & Fleming, Lawrence J. Fleming, St. Louis, Mo., for appellant.

Thomas E. Dittmeier, U. S. Atty., Bruce D. White, Asst. U. S. Atty., argued, St. Louis, Mo., for appellee.

Before LAY, Chief Judge, ARNOLD, Circuit Judge, and WOODS,* District Judge.

WOODS, District Judge.

This litigation concerns the forfeiture of Eighty-Six Thousand, Four Hundred Eighty Dollars ($86,480.00) by the United States. The District Judge [1] upheld the validity of the forfeiture against the contention of the owner, Robert B. Quinlan, Jr., that the money was seized during an illegal

---

* Henry Woods, District Judge, Eastern District of Arkansas, sitting by designation.

1. The Honorable John F. Nangle, United States District Judge, Eastern District of Missouri.

search and without probable cause. We affirm. The facts surrounding the seizure of the money are not in serious dispute. Undercover law enforcement agents posing as sellers arranged a large marijuana transaction with one Boles. On September 25, 1980 they took him to a location in St. Louis where 934 pounds of marijuana were stored in a U-Haul truck. A purchase price of $252,480 was agreed upon. Boles told the agents that he had the purchase funds at the Ramada Inn where he was registered in Room 118. He expressed a desire to purchase an additional amount if available.

Later on the same day Robert B. Quinlan, Jr. and his father entered the picture as associates of Boles. The father's initial interest was to obtain a vehicle to transport the marijuana to California. He rejected the suggestion of one of the agents to use a U-Haul truck, and one of the agents and he then investigated the possibility of using a mobile home. After test driving the latter vehicle, he expressed the fear that it would break down. It was determined that a truck would be purchased the next day.

Boles, while talking to the agents in the latters' car located on the Ramada parking lot, told them about the senior Quinlan's misgivings about the method of transport and left the car to talk to "Pops". At about 8:00 p. m. on September 25, 1980 Boles returned to the agents' automobile accompanied by Robert Quinlan, Jr. Quinlan was concerned about the security of the marijuana and offered to pay someone $1,000 to watch it that night until they could purchase a suitable vehicle in the morning. Quinlan rejected a suggestion by the agents that the U-Haul truck in which the marijuana was then stored be moved to the Ramada Inn where Boles and he could watch it.

At some point during this conversation, the agents requested to see the purchase money since Boles had seen the marijuana. Quinlan and Boles left the vehicle and went to the second floor of the Ramada Inn where the Quinlans were registered in Room 208. Boles then returned to the agents' vehicle with a brown shoulder bag, which he stated contained $100,000. He showed the money to the agent but did not count it. Boles then returned to the second floor. At Boles' suggestion one of the agents obtained another room at the Ramada Inn in which to consummate the transaction. At approximately 1:30 a. m. on September 26, 1980 Boles met with the agents in Room 242. From a suitcase he began to count out the purchase price of the marijuana, telling the agents that if sufficient funds were not contained therein, he had additional funds available.

When he had counted out $230,000, the agents identified themselves and arrested Boles. They then immediately went to Room 208 occupied by the Quinlans. They knocked on the door, which was voluntarily opened by Robert B. Quinlan, Jr., entered the room and arrested him and his father. Underneath a luggage rack and in view of the arresting officers was the partially unzipped shoulder bag shown to agents earlier while they were conversing in the parked automobile. Bundles of money were visible in the bag. The shoulder bag containing currency in the sum of $86,480, which is the subject of this litigation, was seized by the agents and delivered to the custody of the Special Agent in Charge of the Drug Enforcement Division. On January 22, 1981 the United States Attorney filed a complaint for forfeiture and for a warrant for the arrest of the property.[2] Robert B.

2. The United States sought forfeiture pursuant to 21 U.S.C. § 881(a)(6) reading as follows:

The following shall be subject to forfeiture to the United States and no property right shall exist in them:

. . . . .

(6) All moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance in viola-

tion of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter, except that no property shall be forfeited under this paragraph, to the extent of the interest of an owner, by reason of any act or omission established by that owner to have been committed or omitted

Quinlan, Jr. filed an answer in which he admitted ownership of the funds but denied they were to be used for a drug purchase. He also claimed that he had been subjected to an unlawful arrest and an unlawful search. After an evidentiary hearing by the magistrate, the trial court upheld the forfeiture and adopted the magistrate's findings of probable cause.

 Since this was a civil nonjury proceeding, we must accept the findings of the trial court as to probable cause unless clearly erroneous. *One 1961 Lincoln Continental Sedan v. United States,* 360 F.2d 467, 469 (8th Cir. 1966). The facts recited above show that the trial court's conclusion in this respect was supported by abundant evidence. Beyond peradventure the Quinlans were deeply involved with this drug transaction. The shoulder bag containing the currency, which is the subject of this forfeiture, was exhibited to the agents in the automobile to show the ability of Boles and

the Quinlans to pay for the marijuana. The same bag containing visible bundles of money was observed beneath a luggage rack by the agents at the time the Quinlans were arrested in Room 208 of the Ramada Inn. "In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Brinegar v. United States,* 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1948). *See also Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925) and *United States v. One 1950 Buick Sedan,* 231 F.2d 219 (3d Cir. 1956).

 The magistrate found that the arrest of the Quinlans[3] and the entry of the agents into their motel room was unlawful, relying on *Payton v. New York.*[4] We question the magistrate's conclusions in this regard[5] but find it unnecessary to definitive-

without the knowledge or consent of the owner.

3. The arrest was made pursuant to 21 U.S.C. § 878(3)(B) which reads as follows: "Any officer or employer of the Drug Enforcement Administration ... may ... (3) make arrests without warrant ... (B) for any felony, cognizable under the laws of the United States, if he has probable cause to believe that the person to be arrested has committed or is committing a felony."

4. 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). The magistrate felt that this case presented an identical issue. We do not agree. *Payton* involved the application in two factual settings of a New York statute authorizing police officers on probable cause to enter a private residence without a warrant and with force if necessary to make a felony arrest. In the first case the police, without a warrant and using a crowbar, entered Payton's apartment by breaking down his door. Payton was not there, but they seized an incriminating piece of evidence. In the second case, the defendant had been identified by victims of an armed robbery. Police officers went to his home and were admitted by his young son. Defendant was in bed covered by a sheet. They entered the home, arrested him and opened a chest of drawers nearby in which narcotics were found. He was indicted on a narcotics charge and at a suppression hearing the state court held that the evidence was admissible under the New York statute mentioned, *supra.* Reversing the

New York Court of Appeals, the Supreme Court held that the Fourth Amendment rights of these defendants had been violated. We do not view the facts in the instant case as bearing much resemblance to those in *Payton.* There is nothing to show that the entry into Quinlan's motel room was non-consensual. *Cf. Washington v. Chrisman,* 452 U.S. 959, 101 S.Ct. 3106, 69 L.Ed.2d 969 (1982).

5. The magistrate found that Robert Quinlan, Jr. had a "reasonable expectation of privacy" in the motel room which gave him Fourth Amendment protection against the type of entry made here, citing *United States v. Katz,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed. 564 (1967). "Legitimate expectation of privacy" would now seem to be the governing standard in a premises search. *United States v. Salvucci,* 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980). Recognizing the "exigent circumstances" exception, the magistrate found that such test was not satisfied. He was not impressed by the government's argument that the Quinlans would have been alerted by the arrest of Boles and would have fled the motel. Pointing to the fact that there were ten or twelve agents in the area, the magistrate found that a warrant could have been obtained without the risk of escape. This analysis, however, ignores the difficulty of obtaining a warrant at 2:00 a. m. in the morning and the possibility that Quinlan might have offered resistance in an escape attempt. The agents may well have followed a more prudent course in approaching Quinlan when he ap-

ly reach this issue, since the forfeiture was properly upheld in spite of what the magistrate and District Judge conceived to be an illegal arrest and entry. The authorities support the ultimate conclusions of the trial court.

■ In *United States v. One Harley-Davidson Motorcycle*, 508 F.2d 351 (9th Cir. 1974) there was seizure of a motorcycle after a warrantless search. By independent evidence it was established that the motorcycle had been used in violation of 49 U.S.C. § 781. In upholding the forfeiture, the court quoted from the earlier case of *John Bacall Imports, Ltd. v. United States*, 412 F.2d 586 (9th Cir. 1969) as follows: "The mere fact of the illegal seizure standing alone does not immunize the goods from forfeiture." [6] If supported by probable cause, the forfeiture has been upheld in this situation. *Dodge v. United States*, 272 U.S.

530, 47 S.Ct. 191, 71 L.Ed. 392 (1926); *United States v. One Ford Coupe Automobile*, 272 U.S. 321, 47 S.Ct. 154, 71 L.Ed. 279 (1926).[7] Quinlan does not dispute the fact that the two Ninth Circuit and later First Circuit cases are completely *contra* to his position. He simply argues that these decisions are wrong and should not be followed in the absence of controlling precedent from this Circuit. However, we are faced not only with persuasive precedents from other Circuits but also from the Supreme Court as noted, *supra*. He also argues that a different rule should be applied to derivative contraband,[8] which was involved in this case, and contraband per se,[9] and that only the latter should be forfeited on an illegal search. Other courts have not been impressed with this argument,[10] and neither are we. Judge Nangle in his memorandum order adopting the magistrate's recommendations drew the appropriate analogy that

peared at his motel door in response to a knock rather than attempting to apprehend him during an escape when they were without knowledge as to whether he and his father were armed.

"Every arrest must be presumed to present a risk of danger to the arresting officer." *Washington v. Chrisman*, 452 U.S. 959, 101 S.Ct. 3106, 69 L.Ed.2d 969 (1982). The magistrate apparently felt that the "plain view" test would have been satisfied by seizure of the money if the arrest had been legal. *See Coolidge v. New Hampshire*, 403 U.S. 443, 467, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564 (1971). Again relying on *Payton*, he found that the "plain view" exception was vitiated by the illegal arrest. We are not satisfied that the arrest was in fact illegal, but need not reach this issue.

6. Quinlan relies on *One 1958 Plymouth Sedan v. Pennsylvania*, 380 U.S. 693, 85 S.Ct. 1246, 14 L.Ed.2d 170 (1965). This case however stands only for the proposition that *evidence* derived from a search in violation of the Fourth Amendment must be excluded at a forfeiture proceeding, a natural extension of exclusionary rule of *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). He also relies on *Berkowitz v. United States*, 340 F.2d 168 (1st Cir. 1965), but its efficacy has been severely limited by a later First Circuit case holding that forfeiture will be allowed where probable cause is supported by "independent untainted means." *United States v. Pappas*, 600 F.2d 300, 306 (1st Cir. 1979). *See also United States v. One 1975 Pontiac Lemans*, 621 F.2d 444 (1st Cir. 1980).

7. The Supreme Court in *One 1958 Plymouth Sedan v. Pennsylvania, supra*, made it plain that these cases retain their validity and that the distinction referred to in the above footnote is a valid one. "The question involved in both of these cases was not the introduction of evidence seized in violation of the constitution ...." 380 U.S. at 700, 85 S.Ct. at 1250, n. 7.

8. Derivative contraband consists of automobiles, boats, planes and currency which may be lawfully possessed but which became forfeitable because of unlawful use.

9. Contraband per se is property the mere possession of which is unlawful. Examples are heroin (21 U.S.C. §§ 812, 881(f)), moonshine whiskey (26 U.S.C. §§ 5685 and 7302) and sawed-off shotguns (26 U.S.C. § 5861(d)).

10. "Whatever purposes such a distinction may serve in other matters, however, it is not helpful here. Clearly, the Constitution does not require the government to return heroin to a convicted defendant merely because the contraband was unconstitutionally seized. We perceive no constitutional distinction for Fourth Amendment purposes between per se and derivative contraband. If we are constitutionally required to suppress it in one instance, we must in all." *United States v. One 1971 Harley-Davidson Motorcycle*, 508 F.2d 351, 352 (9th Cir. 1979).

an illegal arrest does not bar prosecution for a crime.[11]

The judgment of the district court is affirmed.

11. Citing *Ker v. Illinois*, 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1886); *Frisbie v. Collins*, 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952); *Gerstein v. Pugh*, 420 U.S. 103, 119, 95 S.Ct. 854, 865, 43 L.Ed.2d 54 (1975) and particularly the following language from *United States v. Crews*, 445 U.S. 463, 474, 100 S.Ct. 1244, 1251, 63 L.Ed.2d 537 (1980): "Insofar as respondent challenges his own presence at trial, he cannot claim immunity from prosecution simply because his appearance in court was precipitated by an unlawful arrest. An illegal arrest, without more, has never been viewed as a bar to subsequent prosecution, nor as a defense to a valid conviction."