David R. FINE, Plaintiff,

v.

ST. PAUL FIRE AND MARINE INSURANCE COMPANY, Defendant.

Civ. A. No. 80–3637.

United States District Court,
E.D. Louisiana.

July 12, 1983.

Robert O. Holmes, Gulfport, Miss., for plaintiff.

Ernest L. O'Bannon, New Orleans, La., for defendant.

CASSIBRY, District Judge:

This case presents two riddles: when, if ever, is a slot machine not a slot machine? And, second, when is the possession of contraband not illegal? The litigation arose as a result of defendant St. Paul Fire and Marine Insurance Company's denial of coverage under the terms of a homeowner's policy issued to the plaintiff, David Fine, for the loss by theft of eight antique slot machines. On June 6 and 7, 1983, the case was tried to the Court sitting without a jury; the Court's jurisdiction rests on diversity of citizenship and is uncontested.

*1. Background*

The history of this litigation actually begins in the 1930's when one Emile Iacoponelli ran a profitable, illegal but tacitly accepted, slot machine business in Jefferson Parish. Times changed and, in the 1950's, law enforcement officers cracked down on illegal gambling and drove Mr. Iacoponelli out of business. A loss in their profitability did not, however, diminish the man's affection for his machines; to prevent their confiscation, he moved a number of slot machines into the basement of his sister's home at 200 Ridgewood Drive in Metairie, Louisiana. Over the succeeding years, Mr. Iacoponelli divested himself of a number of these machines; however, he retained or acquired eight of the oldest and finest—restoring and repairing these turn-of-the-century machines as a hobby, protecting them from seizure and destruction by the police. In 1975 Emile died but the slot machines remained in the basement of the house. The machines became "conversation pieces."

On November 15, 1979, the plaintiff, David Fine, purchased the home at 200 Ridgewood Drive from Annette Petit as naked owner and Ruth Iacoponelli as usufructuary. Annette was Emile's daughter; Ruth his wife and Annette's mother. Later that day, plaintiff made or confirmed an agreement with Annette—with Ruth looking on and voicing no objections—to buy the eight slot machines in the basement for $6,000.00. Though the agreement was not reduced to writing, it was understood that plaintiff would pay this amount within the upcoming year.

Plaintiff moved into the house in January of 1980. During January, he also (1) had the slot machines appraised by a vice president of Morton's Auction Exchange, Inc., in New Orleans, who valued the eight machines at a total of $87,500.00, and (2) obtained an insurance policy from the defendant, St. Paul Insurance Company, which, inter alia, provided coverage for loss of "Unscheduled Personal Property" up to $55,000.00. At the time, plaintiff had no idea that the antique slot machines were or might be considered contraband.

On the night of February 29, 1980, plaintiff's home was robbed. Several items were stolen; among these were seven of the eight slot machines (the other machine was found shattered in the carport). Plaintiff filed a proof of loss statement with St. Paul on March 3, 1980. Subsequently, while paying off $1,930.00 for loss of other contents, St. Paul denied coverage for the slot machines, and plaintiff filed this suit shortly thereafter.

## 2. Discussion

■ At trial, the main factual issues for my determination were two: first, the existence of an agreement by Annette Petit to sell the slot machines to the plaintiff and, second, the condition of the machines. As to the existence of an agreement, and the consequent ownership of the machines by plaintiff, I have no doubt that plaintiff had made an agreement to purchase these machines by the time of the theft.[1] Plaintiff and Collette Creppel testified as to the November 15th conversation with and agreement by Ms. Petit, and the tacit assent of Mrs. Iacoponelli, to sell the slot machines to plaintiff. Second, Mrs. Iacoponelli, the one witness who disputed plaintiff's ownership at trial, signed an affidavit on March 31, 1980 in which she stated "that all of the machines were in good condition at the time they were sold to David R. Fine, which was on November 15, 1979, and which were sold for the amount of SIX THOUSAND AND NO/100 ($6,000.00) DOLLARS." In a statement given to St. Paul Insurance agent Earl Smith on April 4, 1980, Mrs. Iacoponelli reaffirmed the validity of this affidavit.[2] Finally, the objective circumstances support the finding of a sale: when mother and daughter sold their house, they left the slot machines in the basement, where the machines remained for over three months until the theft.[3]

■ The other hotly disputed facts centered around the condition and capabilities of these machines. Plaintiff spent a great deal of time attempting to show that the slot machines had been tampered with (or, as plaintiff put it, "neutered") such that they could not be used for gambling. Various witnesses testified that some of the slots had been plugged, pay-out mechanisms removed, back panels were off and "something was missing." The machines would play—in the sense of the wheel or wheels spinning—without coins; one or two of the machines played music when one pulled down the lever. Though no one person sought to play all of the machines (and thus it remains possible that one or more machines could have received coins), I find by a preponderance of the evidence that these machines as they stood from November 15, 1979 to February 29, 1980 could not be used for gambling. Moreover, it is undisputed that the slot machines were not used for gambling.

■ Having said as much, I come to the overarching question: when, if ever, is a slot machine not a slot machine? More precisely, when is a slot machine not a slot machine for purposes of LSA–R.S. 15:31, which subsumes slot machines under the

---

**1.** The issue of ownership is far more complicated. See text, infra.

**2.** In her October 9, 1981 deposition and at trial, Mrs. Iacoponelli strenuously repudiated the contents of the affidavit. She contended the affidavit's second paragraph, the one that discussed the slot machines, had not been there when she signed the affidavit. Between her signing of the affidavit and her deposition, however, Mrs. Iacoponelli's daughter, Annette, had been rejected by plaintiff's father (after dating him for some time) and committed suicide in June of 1980. Though Mrs. Iacoponelli disavowed any feelings of anger toward the Fines at trial, statements at her deposition belie her intimations of equanimity:

"Let me tell you one damn thing right now. You Fines have taken everything in this world that I ever owned, that I ever cared about. I have no more blood left to give you..."

(p. 36) (Mrs. Iacoponelli recounting a phone conversation with plaintiff). Suffice it to say that I found Mrs. Iacoponelli's earlier statements about the slot machines' sale more credible.

**3.** As evidence of the *absence* of an agreement, defendant relies primarily on some vague statements about the slot machines made by plaintiff immediately after the theft. For example, in listing the machines' cost on his proof of loss statement, plaintiff wrote "negotiated as part of another purchase." I found these to be nothing more than imprecisions, and certainly not indicative that no agreement to sell the slot machines ever existed in light of the evidence to the contrary.

heading "gambling devices"?[4] Plaintiff argues that a definition of "slot machine" must include three characteristics at a minimum: (1) a slot or other receptacle capable of receiving coins, (2) some mechanism to generate random play, and (3) some method of producing a possible win consisting of something of value. He further contends that, since the eight machines in question had their slots plugged and their pay-out devices removed, they were not slot machines. Since they were not slot machines, the inquiry need not proceed further: these devices were merely insurable antiques, and the insurance company must provide coverage.

Unfortunately, for plaintiff's position, I cannot accept the initial premise of his argument. Louisiana law is, by and large, clear: once a slot machine, always a slot machine. The device does not change its essential character by the plugging of a slot or the removal of a mechanism. In *State v. Ricks,* 215 La. 602, 41 So.2d 232 (1949), the plaintiff made precisely the same argument that Fine has urged, that "because the machine is mechanically arranged so that it does not automatically eject the prizes that may be won by the player, it is not per se a gambling device." Id. at 233. In rejecting this notion, the Louisiana Supreme Court stated: "It is difficult to discern that the plugging of the automatic pay off has the magical effect of placing the machine beyond the pale of the law." Id.

Such a "magical effect" would make little sense due to the nature of antique slot machines. The deposition of Philip Jaeger, Emile Iacoponelli's close friend and an expert on the operation of slot machines, makes clear that these machines are in no way intricate or complicated. Their mechanisms are simple, visible, and accessible. Counsel for plaintiff asked Mr. Jaeger at his deposition:

Q: For someone who was accustomed to working on machinery, is a slot machine something that they can figure out without too much of a problem?

A: If they are a mechanic, they can fix a slot machine.

Q: It's not an overly complicated mechanism?

A: No, I don't think so. (p. 23)

Every witness with any knowledge of the eight slot machines agreed they were in good working condition. There was no evidence of anything that had been done to these machines which might permanently and irrevocably have impaired their use as gambling devices. That being the case, the plugging of their slots or the removal of certain mechanisms seems largely irrelevant. It simply cannot be that five minutes, or one hour, or even one day of tinkering with a slot machine's mechanism could serve to bring the machines under the umbrella of the term gambling device, while five more minutes of plugging and removing would make them "harmless antiques." Distinctions in the law cannot be so inconstant.[5] Undoubtedly, then, the eight machines were slot machines under R.S. 15:31.

### 3. The Law

With the determination that these slot machines fit the definition of "slot machines" under R.S. 15:31, I must consider

---

[4]. Louisiana Revised Statute 15:31 mandates that:

A. All law enforcement officers of municipal police forces, sheriff's departments and the division of state police are hereby authorized and empowered and it is made mandatory and compulsory on their part to confiscate and immediately destroy all gambling devices or machines used for gambling that come to their attention.

B. As used in this section the term "gambling device" means:

(1) any slot machine ...

[5]. To be sure, one could devise a closer case. For example, what if a slot machine had been completely dismantled into its component parts? Would it still be a slot machine? The potentiality of difficult line-drawing problems in extreme cases, however, does nothing to change my conclusion on the facts of this case.

the second conundrum presented by this case: when is the possession of contraband not illegal? Contraband, according to Black's Law Dictionary (1979), consists of "any property which is unlawful to produce or possess." In Webster's Dictionary, contraband is "goods or merchandise whose importation, exportation, or possession is forbidden." Additionally, my research has revealed no case (except as referred to below) in which the term "contraband" has been used without the case also alluding to some unlawful violation. By definition, it would appear, the possession of contraband is illegal.

Appearances prove to be deceptive. For, in *Brown v. State, Etc.,* 392 So.2d 415 (La. 1980), the Louisiana Supreme Court stated:

> Respondent argues that the absence of a statute prohibiting the possession and use of slot machines removes them from the designation contraband. We answer this argument by observing that slot machines have historically been treated as contraband. Since the repeal of the statutes making possession and use of slot machines illegal, this Court has consistently referred to slot machines as contraband.

Id. at 418. Hence, the state law applicable to this suit[6] contains two not easily reconcilable propositions:

1. The possession of slot machines is legal.

2. Slot machines are contraband.

Springing from # 2, defendant's argument is extremely simple: contraband cannot be insured. Using # 1, plaintiff's argument is almost equally as simple: An "insurable interest" in property under Louisiana law need only be "lawful and substantial." LSA–R.S. 22:614. Slot machines are "lawful"; therefore, they can be insured. To resolve this case, I must reject one of the *Brown* propositions. For the following reasons, I have rejected # 2.

First and most importantly, the law concerning the legality of slot machines is clearer than the notion that slot machines are contraband. In *Brown,* the court affirmed that, "With the codification of the criminal statutes of the state in 1942 (Act No. 43), the legislature repealed the acts which made it a misdemeanor to play or possess slot machines." 392 So.2d at 418. Notwithstanding this fact, the court went on to observe that slot machines "have historically been treated as contraband" and that "this Court has consistently referred to slot machines as contraband." Id. Yet nowhere did the court define contraband and, given what seems to be the widely accepted meaning of the term, the historical argument was ill-founded: possession of slot machines had not been unlawful for 28 years. Furthermore, the fact that the Louisiana courts had, at times, referred to them as contraband is reflexive and hardly a reason to explain *why* slot machines are contraband. Certainly, the legislature has not referred to them as such, yet the court stated:

> R.S. 15:31 constitutes at least as direct a legislative pronouncement that slot machines are contraband as would a statute simply making their possession illegal.

Id. "Simply?" I think not, since it is the fact that an item is illegal to possess or

---

6. The Louisiana legislature amended R.S. 15:31 in 1981 to exempt antique slot machines (the definition of which covers the eight in question) from confiscation without a hearing and to provide for private ownership of such machines, thus making it clear that at least *antique* slot machines are not contraband. The effective date of the amendment was July 23, 1981. In denying plaintiff's motion for summary judgment at an earlier date, I implicitly found that the amendment was not retroactive. My decision was based on the general rule that statutes apply only prospectively, that this amendment created substantive rights not previously enjoyed, and that nothing in the language of the amendment indicates the legislature's intention of retroactive application. Though the issue is close, plaintiff has failed to convince me to change my ruling on this point.

used to further some unlawful activity[7] which gives rise to the item's designation as contraband.

The possession of slot machines is lawful. This satisfies the first requirement of an "insurable interest" in Louisiana. It remains for me to determine whether plaintiff's interest in items subject to confiscation and destruction was "substantial." Assuming arguendo that the slot machines were "not property capable of private *ownership*," *Killian v. Craft,* 226 La. 374, 76 So.2d 401, 402 (La.1954) (emphasis added), nevertheless, plaintiff's economic interest in the machines was sufficient to constitute an insurable one. The machines were quite valuable, and plaintiff was certainly not wagering on property unconnected to him. He could have transported the machines to a state in which slot machines are legal and sold them. Presumably, he could have sold them in Louisiana—so long as the law enforcement officers did not hear of it. Admittedly, any scenario the court could devise to suggest "substantiality" has this rather paradoxical feature: plaintiff would have had to *act* as if the machines were unlawful even though they were not unlawful. This paradox flows from the mutually exclusive propositions of the *Brown* case. In any event, whether styled a "possessory interest," an "ownership interest good against everyone but the state," or an "interest in the machines' control," plaintiff's

bundle of rights in the eight slot machines was "substantial."

Two cases from Louisiana lend support, at least by analogy, to these conclusions. (Needless to say, no case has directly addressed the question of insuring slot machines.) In *State Farm Mutual Automobile Insurance Co. v. Price,* 378 So.2d 599 (La. App. 3rd Cir.1979), the defendant was the good faith purchaser of a stolen car. In finding an "insurable interest" for defendant, the court explained that,

... under the jurisprudence of this state ownership of the property is not always required in order for one to have an insurable interest ... although defendant did not own the car at the time he secured the policy, he was in possession of the automobile, with an interest in preserving it.

Id. at 601. Even if Fine did not own the machines,[8] he surely had an interest in their preservation.

In another vein, the federal district court held in *McDonough v. Hartford Fire Insurance Co.,* 34 F.Supp. 880, 884 (E.D.La.1940):

A contract of insurance covering the prohibited transportation of liquor being in aid of and an encouragement to law violations, is against public policy and not enforceable.

Defendant brought the *McDonough* case to the court's attention but its implications cut

---

**7.** Sometimes referred to as "derivative contraband." See, e.g., *U.S. v. Eighty-Eight Thousand, Five Hundred Dollars,* 671 F.2d 293, 295 (8th Cir.1982). There, the court of appeals defined the two types of contraband:

    a) Contraband per se is property the mere possession of which is unlawful.

    b) Derivative contraband consists of things, such as automobiles or boats, which may be lawfully possessed but which may become forfeitable because of unlawful use.

Id. at notes 8–9.

Many years ago, slot machines were contraband per se. Today, if used for the purpose of gambling, they may become derivative contraband. The eight machines involved in this case were neither.

**8.** Because the issue of ownership is not central to my decision, I have not fully addressed my-

self to the exceedingly complex ramifications of the *Brown* court's dual views that the possession of slot machines is legal, yet they are not property that can be owned. As a legal matter, however, unless slot machines are contraband per se or become derivative contraband by some illegal usage, see note 7, supra, I know of no other applicable, legal roadblock to the machines' private ownership. Conversely, if a legislative enactment allowing confiscation by a state makes something which is legal to possess "contraband," the roadblock of due process to that action looms rather largely. In short, I believe that the First Circuit Court of Appeals decision in *Brown,* 385 So.2d 436 (La. App.1980), which held that antique slot machines were not contraband, contains the correct analysis.

in favor of plaintiff. If the instant insurance contract aided or encouraged in any way some violation of the law, then I would not hesitate to hold the policy unenforceable. However, it cannot be gainsaid that plaintiff's insurance of his slot machines aided or encouraged any unlawful violation. Only when a slot machine is used to commit the crime of gambling is there any prohibited activity; these machines were not, could not, and had not been used in thirty years, for gambling purposes. Moreover, though I have not applied the 1981 amendment retroactively,[9] I note that the present public policy of Louisiana would clearly favor the insurance of antique slot machines.

In sum, plaintiff's possession of the eight slot machines was legal. Being "lawful and substantial," his interest in the property constituted an "insurable interest." The insurance violated no public policy. As such, the insurance company must pay.

The limit of defendant's liability was $55,000.00. In addition, the policy contained an "Inflation Guard," which provided that the "Limits of liability specified in the Declarations of this policy . . . shall be increased by 1½% of such specified limits at the end of each period of 3 months after the effective date." How this clause was to be applied in a particular case is not spelled out in the policy; however, I have determined that only one inflation increase should be taken into account. The effective date of the policy was January 23, 1980. The defendant denied coverage on July 8, 1980; its action terminated the policy and, in essence, froze the inflation guard after completion of but one three-month period. The limit of defendant's liability, then, becomes $55,825.00. Of this amount, the first $250.00 was deductible and defendant previously paid out $1,930.00. Thus, defendant is liable for the remainder: $53,645.00.

The defendant's denial of coverage was not, however, in bad faith. Though plaintiff suggests to the contrary, the evidence indicates that the insurance company considered the "contraband" argument *before* the critical 60-day period under LSA–R.S. 22:658 had elapsed. Plaintiff failed to prove that the confused legal status of slot machines was not, at the very least, partially responsible for the denial of coverage and, inasmuch as plaintiff concedes this ground is not wholly "arbitrary" or "capricious," I reject his claim for penalties and attorney's fees.

The clerk shall prepare a judgment consistent with this opinion.