United States Court of Appeals
 For the First Circuit

No. 98-1647

 UNITED STATES OF AMERICA,

 Appellee,

 v.

 LARRY JOSEPH LeBLANC,

 Defendant, Appellant.

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MAINE

 [Hon. Morton A. Brody, U.S. District Judge]

 Before

 Selya, Circuit Judge,

 Coffin, Senior Circuit Judge,

 and Boudin, Circuit Judge.

Wayne R. Foote for Larry Joseph LeBlanc.
Ronald M. Spritzer, Environment and Natural Resources
Division, Appellate Section, with whom David C. Shilton and
Bruce W. Pasfield, Environment and Natural Resources Division,
Appellate Section, Lois J. Schiffer, Assistant Attorney General,
and John McNeil, Regional Criminal Enforcement Counsel,
Environmental Protection Agency, were on brief for the United
States. 

March 5, 1999

BOUDIN, Circuit Judge. This is an appeal from a sentence
imposed under the Sentencing Guidelines, and the issues are
peculiarly complicated. Because the criminal charges at issue were
resolved by a guilty plea, we draw the facts of the case primarily
from the presentence report, the sentencing transcript and various
other materials before the district court. See United States v.
Gill, 99 F.3d 484, 485 (1st Cir. 1996).
In March 1993, a Canadian company called City Sales, Inc.
("City Sales") began purchasing a chlorofluorocarbon called CFC-12,
popularly known as freon, from a Canadian supplier and shipping it
to commercial buyers in the United States. City Sales was then
owned and managed day-to-day by Larry J. LeBlanc, who was
responsible for negotiating the terms of the freon purchases in
Canada and who directed City Sales employees to arrange for the
transportation of the freon into the United States. 
During the pertinent period, U.S. law prohibited the
importation of chlorofluorocarbons such as freon unless the
importer (in this case, City Sales) possessed an "unexpended
consumption allowance" for each kilogram of the chemical. 42
U.S.C. 7671a(a); 40 C.F.R. 82.4. The United States had
instituted restrictions on the importation of certain CFCs in 1990
pursuant to an international treaty (the Montreal Protocol) aimed
at phasing out their production and consumption in the interest of
global environmental protection. See 42 U.S.C. 7671 et seq.; 40
C.F.R. 82.1 et seq. 
Suspicious of LeBlanc's actions, Canadian authorities
notified LeBlanc in June 1993 that City Sales would not be granted
additional CFC-12 export permits until City Sales could prove that
it or its U.S. customers had the consumption allowances required to
conduct the freon transactions at issue. Nevertheless, LeBlanc
instructed his staff to continue selling freon to U.S. consumers,
and according to the presentence report, LeBlanc sold more than
$800,000 worth of freon to U.S. customers between September 1993
and July 1994. The United States also suffered excise tax losses, 
26 U.S.C. 4681, estimated to be more than half a million dollars,
on the freon thus imported.
On April 29, 1997, a federal grand jury indicted LeBlanc
on 21 counts. Thereafter, pursuant to a plea agreement, LeBlanc
pled guilty to 8 counts of violating the Clean Air Act, 42 U.S.C.
7413(c)(1), for knowingly causing the importation of freon into
the United States without the required consumption allowances, and
to 6 counts--covering 6 of the same 8 transactions--of violating 18
U.S.C. 545, a customs statute, for knowingly bringing into the
United States merchandise contrary to law. The remaining counts,
involving charges of false representations on customs documents and
a catch-all conspiracy count, were dismissed.
The federal probation office's presentence report, the 
prosecution, and the defendant each took a different view as to how
LeBlanc's sentence should be computed. At the sentencing, everyone
(including the judge) agreed that the counts to which LeBlanc pled
guilty should be "grouped" as "closely related counts" under
U.S.S.G. 3D1.2. We accept the conclusion as plausible on the
present facts without independently endorsing it. See SEC v.
Lehman Brothers, Inc., 157 F.3d 2, 5 (1st Cir. 1998). 
Where all counts fall within a single group of closely
related counts, the base offense level for the entire group is the
highest offense level applicable to any single count or, if the
offense level is determined largely by an aggregate amount (e.g.,
drug quantity), by the level determined after such aggregation. 
U.S.S.G. 3D1.3. To make this determination requires a count-by-
count calculation. At this point, two different guidelines
presented themselves for consideration, LeBlanc having pled guilty
to 14 counts comprising offenses under two different statutes. 
Environmental violations fall under part Q of the
guidelines, and two different part Q guidelines specifically refer
to the Clean Air Act provision to which LeBlanc pled. U.S.S.G. 
2Q1.2, 2Q1.3. The former applies to mishandling or unlawfully
transporting "hazardous or toxic substances" and the latter to
mishandling of other environmental pollutants. No one has argued
that freon falls into the former category, so we pass by this
possibility. Under the latter guideline, the base offense level is
6, subject to various possible upward adjustments (not based on
amount).
The other pertinent guideline is U.S.S.G. 2T3.1, which
appears in the guidelines part T governing "customs taxes" and
which applies to "evading import duties or restrictions
(smuggling)"; its statutory cross references specifically include
18 U.S.C. 545, to which LeBlanc pled. This guideline bases the
offense level primarily on the amount of the lost customs taxes
inflicted as measured by a general tax loss table. U.S.S.G. 
2T4.1. However, because no duty was payable on the importation of
freon, LeBlanc's base offense level under the guideline would have
been 4, for offenses where "the tax loss did not exceed $100."
After a two-day sentencing hearing, the district court
concluded that LeBlanc should be sentenced under the customs tax
guideline and associated tax loss table based upon the amount of
federal excise taxes on freon that the U.S. producers avoided by
dealing with LeBlanc. See 26 U.S.C. 4681. The probation
officer's report, whose figures are not challenged, stated that the
freon involved in the counts of conviction represented $546,000 in
lost excise taxes and an offense level of 17 under the standard tax
table. The government supported this approach, although it urged
use of a larger excise tax figure.
In reaching this conclusion, the district court relied
upon application note 2 of the customs tax guideline, which reads
in full:
Particular attention should be given to those
items for which entry is prohibited, limited,
or restricted. Especially when such items are
harmful or protective quotas are in effect,
the duties evaded on such items may not
adequately reflect the harm to society or
protected industries resulting from their
importation. In such instances, an upward
departure may be warranted. A sentence based
upon an alternative measure of the "duty"
evaded, such as the increase in market value
due to importation, or 25 percent of the
items' fair market value in the United States
if the increase in market value due to
importation is not readily ascertainable,
might be considered.

U.S.S.G. 2T3.1 app. note 2 (emphasis added). Apparently viewing
the excise tax as an "alternative measure" specifically
contemplated by the application note, the district court declined
the government's request to label its assessment a "departure."
Having set 17 as the base offense level, the court
reduced the figure by 3 levels for acceptance of responsibility,
U.S.S.G. 3E1.1(a), and refused the government's request to make
an upward adjustment for LeBlanc's role in the offense. The
resulting offense level of 14 produced a guideline range of 15 to
21 months in prison. The court sentenced LeBlanc to 15 months
imprisonment and a $28,000 fine. LeBlanc now appeals, arguing
primarily (as he did below) that the environmental offense
guideline should have been used to set his sentence.
Interpretation of the guidelines presents issues of law
subject to plenary review. See United States v. Lombard, 5 F.3d
568, 569 (1st Cir. 1993). In this case, we believe that the
district court was misled by the government and the probation
officer; their common initial resort to the customs guideline to
set the adjusted offense level does not comport with the
guidelines' provisions and sequences for calculating the offense
level or departing from it. Whether the district judge might yet
come out at the same place, after following the guidelines and
consciously exercising his discretion to depart, is a different
matter.
Where counts are grouped as closely related, the grouping
rules are quite specific: the next step is to determine the highest 
offense level applicable to any one count among all of the counts
thus grouped. See U.S.S.G. 3D1.3(a). For this purpose it is the
(partly) adjusted offense level and not the base offense level that
controls. Id. app. note 1. Here, the base offense level for each
of the customs counts was 4 and no specific adjustment was
proposed; the offense level for each of the environmental offense
counts was 6, even if no specific offense adjustments applied. For
this reason alone, the environmental offense guidelines' offense
level of 6 represented the controlling offense level, subject to
remaining adjustments and possible departure.
In this case, there is a further and independent reason
why this course was required. Quite apart from the grouping rules,
the customs tax guideline itself--in the guideline and not the
commentary--contains the following cross reference: "If the offense
involves a contraband item covered by another offense guideline,
apply that offense guideline if the resulting offense level is
greater than that determined above [i.e., by the tax table or the
default figure of 4]." U.S.S.G. 2T3.1(c). A common meaning of
"contraband" encompasses items "imported into a country against its
laws." Black's Law Dictionary 322 (6th ed. 1990); cf. Fine v. St.
Paul Fire and Marine Ins. Co., 567 F. Supp. 1252, 1255-57 (E.D. La.
1983).
The district court may well have thought that the base 
offense level of 17, reached under its "alternative measure"
approach approved in application note 2 of the customs guideline,
represented the proper comparison with the offense level 6 reached
under the environmental guideline. But while application note 2 is
somewhat terse, its "alternative measure" language contemplates
that it be implemented by a departure from the guideline, although
one expressly permitted by it (sometimes called a "guided
departure"). A close reading of the application note (quoted
above) supports the government's concession that the "alternative
measure" is to be achieved by a departure. Thus, the controlling
offense level after the grouping-rule computation was 6 under the
environmental offense guideline, assuming no specific offense
adjustment.
But why, someone might ask, should the comparison be made
of offense levels before possible departures rather than afterward? 
The short answer, but not the only one, is that the guidelines so
instruct. This is explicit in the grouping guideline which
provides that, in determining the highest-level count, "[t]he
'offense level' for a count refers to the offense level from
Chapter Two after all adjustments from Parts A, B, and C of Chapter
Three." U.S.S.G. 3D1.3 app. note 1. And, in the sequence of
steps prescribed for application of the guidelines, id. 1B1,
departing (under part K of chapter 5) comes only at the very end of
the process after the offense level is established.
The longer answer is fundamental to the departure concept
embodied in the guidelines. The idea, simply put, is that the
adjusted offense level and criminal history computed under the
guidelines create a presumptive, deliberately narrow range or
baseline for the sentence; in the interest of equal treatment, most
defendants sharing these pertinent characteristics will get a
sentence within the range. And departures will have to be
considered, justified, and subject to appeal as departures from
that baseline which otherwise must apply to offenses within the
"heartland" represented by the prescribed guideline range. SeeUnited States v. Rivera, 994 F.2d 942, 949-50 (1st Cir. 1993).
The government has written an able brief in support of
its view that the district judge properly resorted to the customs
guideline at the outset and erred only in failing to call his
ultimate decision a departure. But its technical parsing of the
guidelines is not persuasive: it misreads the grouping rules (seenote 1, above); and it violates the directive that a prescribed
comparison of offense levels within the grouping rules or as
between different guidelines means the initial adjusted offense
levels and not the levels computed after departure. U.S.S.G. 
1B1, 3D1.3, app. note 1.
The government's broader argument is that it would be
absurd to punish LeBlanc under the environmental guideline based on
an offense level of 6 when that guideline is not correlated with
quantity and is ill-adapted to measuring the full range of harms
caused by LeBlanc's scheme. But that is a possible reason for a
departure (which might take the judge back to the tax table as a
useful analogy) and not a reason for bypassing the steps, or
distorting the concepts, that underlie the guidelines and must be
followed uniformly in many different contexts.
In this case, a departure could readily be justified. 
Even if the customs and environmental offenses are grouped as
closely related, they fail to account at all for a third threat to
the public caused by LeBlanc's conduct: namely, a loss of revenues
through excise tax losses. A departure on this ground is not an
end-run around the remarkably lenient grouping rules. The excise
tax loss was not reflected at all in the offense level under either
the environmental offense guideline or the customs guideline.
Further, the environmental harm in this case itself may
be outside the heartland of its guideline, making it an "atypical"
case. Diaz-Villafane, 874 F.2d at 49. Unlike the ordinary
"mishandling" of pollutants, for which 6 is the base offense level,
LeBlanc's offense may have disrupted, if only at the margin, a
major program designed to deal with a world-wide threat of
stratospheric ozone depletion. The problem is not the specific
release of LeBlanc's freon--which might otherwise have occurred in
Canada--but the tendency of such smuggling to undermine the
incentive structure for American industry to switch to new, less
threatening substitutes.
As the government explained at LeBlanc's sentencing
hearing, a flood of relatively inexpensive, black market freon in
the United States may have hampered the creation of markets for the
more expensive replacement products U.S. industry has developed. 
Of course, calibrating this harm is much more difficult than using
the tax loss table to measure the excise tax loss. Departures are
discretionary, and the district judge is free to depart solely to
take into account the fiscal loss which is easily calibrated and
more easily justified as a departure. 
LeBlanc has offered an ingenious reason for objecting to
the use of the tax loss table even as a measure of fiscal loss. He
points out that the table is primarily directed to wilful tax
evasion, which involves a scienter element that (put very loosely)
involves a conscious effort to cheat the government on taxes. SeeU.S.S.G. 2T1.1. Indeed, the absence of such a motive led us to
sustain a downward departure in a case where the applicable
guideline literally called for use of the tax loss table. United
States v. Brennick, 134 F.3d 10, 14 (1st Cir. 1998). LeBlanc says
that there is no proof that he intended to evade, or assist others
in evading, excise taxes at all.
This may be so, but the table is pertinent here merely to
help the district court to measure a reasonable departure, if the
judge wants to depart. While LeBlanc may not have wilfully
intended to deprive the government of taxes, his wilfulness in
violating the environmental statute seems apparent from June 1993
onward; other lost excise taxes were disregarded (see note 2
above); and (as noted above) the tax table ignores other harm done
by LeBlanc to the CFC regime that may well be outside the heartland
of the environmental offense guideline. On balance, the tax loss
table may be generous to LeBlanc, and its use here surely would not
be "unreasonable." 18 U.S.C. 3742(f); Cali, 87 F.3d at 581.
In one sense, a remand may be a waste of time. The
district judge obviously preferred the "alternative measure" that
produced after adjustment an offense level of 14; nothing obliged
him to adopt it. His preference may not be changed by calling it
a departure or by appreciating that, absent a departure, the
governing offense level would effectively be computed under the
environmental offense guideline. The government claims that
several district courts have used the excise tax calculation in
freon cases, and the government professes to endorse the general
approach.
Nevertheless, the likelihood and lawfulness of a similar
result does not let us depart for the district judge. The initial
decision to depart must be made by the district judge, appreciating
that a departure is what is involved. Still, it may ward off a
further useless appeal for us to repeat that on the present facts
a departure would be permissible and that a departure to an
adjusted base offense level of 14 would not strike us as
unreasonable, if the district judge chose to impose it.
The sentence is vacated and the case is remanded for re-
sentencing in accordance with this opinion.