**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**$84,000 U.S. CURRENCY, Defendant,**

v.

**Donald HOLMES and Max Reyes,
Claimants-Appellants.**

**No. 82–1602.**

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 10, 1982.
Decided Sept. 12, 1983.

Robert B. Creager, Barry, Anderson, Creager & Wittstruck, Lincoln, Neb., for intervenor.

Edward J. Moran, Asst. U.S. Atty., Dan K. Webb—U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before CUDAHY and COFFEY, Circuit Judges, and SWYGERT, Senior Circuit Judge.

COFFEY, Circuit Judge.

The government, as plaintiff, filed this civil action for the forfeiture of $84,000 in U.S. currency seized from the claimants pursuant to 21 U.S.C. § 881(a)(6). Donald Holmes and Max Reyes, as claimants, answered the government's forfeiture claim contesting the legality of the seizure of the currency and the applicability of the forfeiture statute. The district court held that 21 U.S.C. § 881(a)(6) was applicable and that the currency had not been illegally seized. We affirm.

On the evening of September 10, 1981, Drug Enforcement Administration ("DEA") Agent Michael Streicher and Chicago Police Officer Rosemary Burzinski were assigned to Chicago's O'Hare International Airport to monitor the arrival of passengers on flights from certain "source cities" in an effort to control the flow of illegal drugs.[1] The law enforcement officers were awaiting the arrival of United Airlines Flight 149 from Fort Lauderdale, Florida, a DEA designated source city, to observe the passengers as they left the aircraft. At approximately 8:45 p.m., Flight 149 parked at United Airlines Gate F–7, and the passengers deplaned and walked into the concourse. Two members of the first group to emerge from the gate were the claimants, Donald Holmes and Max Reyes.

Holmes and Reyes milled around the gate area after deplaning, glancing about as if looking for someone or something. The officers' attention was attracted to the two young men because of their anxious manner, suspicious conduct, casual dress and the fact that Holmes was fair-skinned and displayed no tan; all factors fitting the DEA "drug courier profile"[2] utilized by officers to alert them to possible drug traffickers.

Following their survey of the gate area, Holmes and Reyes entered the concourse and proceeded to a television monitor screen displaying the arrival and departure times of United Airlines flights. After viewing the screen for what seemed to Officer Burzinski to be an inordinately long period of time, Holmes and Reyes continued down the concourse corridor followed by Agent Streicher and Officer Burzinski. The appellants walked slowly down the corridor toward the junction of Concourses E and F, glancing back over their shoulders several times as if trying to determine whether they were being followed. Holmes and Reyes entered a cocktail lounge located at the juncture and purchased two drinks. Agent Streicher and Officer Burzinski then observed the claimants leave the lounge and take their drinks to the check-in area at Gate E–2. The officers at this time positioned themselves opposite the gate to continue their observation.

Holmes and Reyes stood in line at Gate E–2 and checked in for a 9:35 p.m. flight to Omaha, Nebraska. After reserving their seats, the claimants walked away from the

---

[1] According to testimony of Agent Streicher, a DEA source city is "[a] city in the United States where large quantities of marijuana, cocaine, heroin, [and] quaaludes are [located and from which the drugs] are then redistributed to other points in the United States."

[2] A drug courier profile is "a flexible list of common characteristics exhibited by drug couriers as compiled by the DEA." *United States v. Swayne*, 700 F.2d 467, 471 (8th Cir. 1983).

gate and were approached by Agent Streicher and Officer Burzinski. The law enforcement officers promptly identified themselves and asked Holmes and Reyes for identification. The claimants produced first-class tickets and driver's licenses issued in their appropriate names. Officer Burzinski asked Holmes and Reyes if they were traveling with luggage and they replied they were. The officers noticed, however, that Reyes' ticket portfolio contained no baggage claim stub and they questioned him about the discrepancy. Reyes' ticket was returned to him and he proceeded to the check-in counter to inquire about the issuance of a baggage claim check. During this conversation between the officers and the claimants, Reyes' voice quivered, and both he and Holmes appeared to the officers to be nervous throughout the encounter.

Prior to Reyes' return to the check-in counter, the claimants were asked by Agent Streicher and Officer Burzinski during the initial encounter if they would voluntarily consent to a search of their luggage. After being advised of their right to refuse, the claimants agreed to let the officers search their baggage. Officer Burzinski then copied down Holmes' claim ticket number and a description of Reyes' luggage and left the corridor to contact United Airlines personnel about locating the claimants' luggage. After originally giving his consent and while Burzinski was arranging for the search of the luggage, Reyes voiced some hesitation about consenting to a search of his luggage. To allay Reyes' fears, Agent Streicher informed the claimants "that [the officers] were not interested in small quantities of marijuana or pills or coke, and that if ... all they had in their luggage was a small quantity, that [the officers] would just check that, and if there was some [the officers] would take it and discard it and they could be on their way." In response to Agent Streicher's comments, the claimants stated that their bags contained small quantities of marijuana and cocaine and that

they would allow the officers to open the luggage.

Officer Burzinski returned to the group after arranging with United Airlines personnel for the segregation of Holmes' and Reyes' luggage. Shortly thereafter, the officers were informed that the luggage had been placed in a basement area below Gate E–2. Officer Burzinski, Agent Streicher, Holmes and Reyes descended a flight of stairs and entered a small, dark non-public area. The claimants identified the luggage located in the secluded area as theirs but prior to searching the baggage Agent Streicher noticed bulges in Reyes' pants legs at the tops of his boots. Agent Streicher stated that for his safety he "patted down" Reyes and felt a hard object which he was unable to identify by touch. Streicher then directed Reyes to remove his boots and bundles of money spilled out of his pants legs and his boots. Streicher placed the money in Reyes' suitcase and proceeded to search Holmes who also had large quantities of money in his boots and inside his waistband and pants legs.

A search of Reyes' and Holmes' suitcases uncovered small quantities of marijuana and cocaine. The claimants were placed under arrest, informed of their *Miranda* rights and taken, along with their suitcases, to the DEA office at O'Hare.[3] Holmes and Reyes were processed and the money in their possession was counted in their presence. In the case of Reyes, $30,000 of the money found on his person was confiscated by the officers and $25 was returned to him. The officers seized $54,000 of the money discovered in Holmes' suitcase and on his person and returned $91 to him. A DEA supervisor, Joseph Salvemini, arrived and interviewed the claimants. After the claimants completed and signed written statements regarding the seized currency they were released and conveyed by Streicher and Burzinski to a nearby hotel to await the next flight to Omaha the following morning.[4]

**3.** The claimants neither at the trial nor on appeal challenged the arrest.

**4.** Reyes and Holmes were released after they agreed with Special Agent Salvemini that they would voluntarily surrender to the United

On March 17, 1981, the United States filed its complaint for civil forfeiture of the $84,000 seized under 21 U.S.C. § 881[5] and Holmes and Reyes filed their claims thereafter. The claimants denied that the monies were used or were intended to be used for illegal purposes and alleged that their constitutional rights had been violated during the seizure of the funds. A trial was held in the district court and a judgment was entered ordering the appellants' previously confiscated $84,000 forfeited to the United States. It is from the court's order of forfeiture that the claimants appeal.

## ISSUES PRESENTED

Issue 1: Did the district court err in determining that the $84,000 involved herein was not seized in violation of Holmes' and Reyes' constitutional rights?

Issue 2: If the circumstances of the seizure did not give rise to a constitutional violation, did the district court commit error in determining that the monies taken from Holmes and Reyes were properly forfeited to the United States?

## I.

The claimants contend that the evidence introduced by the government in support of the forfeiture was illegally obtained in violation of their constitutional rights for the following reasons:

(A) The initial encounter between the law enforcement officers and Holmes and Reyes constituted an unlawful arrest and detention in violation of their Fourth Amendment rights against unreasonable seizures;

(B) The money uncovered during the "pat down" searches of their persons was illegally obtained in violation of their Fourth Amendment rights against unreasonable searches; and

(C) The statements signed by the claimants while in custody were improperly procured and involuntarily given and the admission of the statements violated their Fifth Amendment rights against self-incrimination.

The government concedes the applicability of the exclusionary rule to forfeiture proceedings but contends the district judge properly concluded that the government demonstrated that no violation of the claimants' constitutional rights occurred. *United States v. Eighty-Eight Thousand, Five Hundred Dollars,* 671 F.2d 293, 297 n. 6 (8th Cir.1982). In order to review the propriety of the district court's determination of the legality of the actions of the law enforcement officers, we will address each of the claimants' alleged constitutional violations separately.

## A.

First of all, Holmes and Reyes maintain that the initial contact by the government agents was an unlawful seizure rendering all evidence obtained thereafter (including the funds seized and the statements obtained while the claimants were under arrest) inadmissible as "fruit of the poisonous tree." *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963). This court has recently reiterated the test to be applied in determining whether a seizure has occurred in an airport police/citizen encounter such as the one involved herein. *See United States v. Seven-*

States Attorney's office if their future cooperation was required. This agreement was entered into with the consent of the United States Attorney.

**5.** 21 U.S.C. § 881 provides in pertinent part:
"(a) The following shall be subject to forfeiture to the United States and no property right shall exist in them:
"(6) *All moneys,* negotiable instruments, securities or other things of value furnished or *intended to be furnished by any person in exchange for a controlled substance in viola-*

*tion of this subchapter,* all proceeds traceable to such an exchange, and *all moneys,* negotiable instruments, and securities used or *intended to be used to facilitate any violation of this subchapter,* except that no property shall be forfeited under this paragraph, to the extent of the interest of an owner, by reason of any act or omission established by that owner to have been committed or omitted without the knowledge or consent of that owner." (emphasis added).

*ty-Three Thousand, Two Hundred Seventy-Seven Dollars,* 710 F.2d 283, 288 (7th Cir. 1983) (citing *Florida v. Royer,* —— U.S. ——, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983)). Applying the objective "reasonable person" test we affirm the district court's determination that no seizure of Holmes and Reyes occurred until after the officers and the claimants entered the non-public area below Gate E–2, as the appellants were free to leave up until that time and voluntarily accompanied the officers.

In affirming the forfeiture in *Seventy-Three Thousand, Two Hundred Seventy-Seven Dollars,* this court followed Justice Stewart's "reasonable person" test, as set forth in *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980), in determining whether a seizure has occurred in an airport surveillance case.

> "[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."

*Mendenhall,* 446 U.S. at 554, 100 S.Ct. at 1877 (footnote omitted).

■ The determination of whether Holmes and Reyes were seized under the "reasonable person" test is a highly factual one, dependent upon the specific circumstances of this case. Our standard of review is limited to inquiry into whether the district court's determination is clearly erroneous, and requires that particular deference be given to the district judge who had the opportunity to hear the testimony and observe the demeanor of the claimants and the law enforcement officers. *Seventy-Three Thousand, Two Hundred Seventy-Seven Dollars,* 710 F.2d at 288.[6]

■ Three major issues are addressed in reviewing an airport police/citizen encounter: (1) the conduct of the police; (2) the characteristics of the individual citizen; and (3) the physical surroundings of the encounter. *Id.* at 289.

■ In examining the conduct of Agent Streicher and Officer Burzinski, the district court had to determine whether "the officer[s], by means of physical force or show of authority, had in some way restrained the liberty of [the claimants] such as [they were] not free to walk away." *United States v. Moya,* 704 F.2d 337, 341 (7th Cir. 1983) (citing *United States v. Black,* 675 F.2d 129, 134 (7th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1520, 75 L.Ed.2d 945 (1983)). In reviewing all the testimony, the trial judge came to the conclusion "that there was not any threatening presence by the officer and the agent. There was no display of weapons here. The officers were in civilian clothes. There was no use of language or a tone of voice indicating that compliance might be compelled or would be compelled." Relying on the record before us we hold that the findings of the district court are not clearly erroneous and we defer to the findings and conclusion of Judge Kocoras who was in the best position to weigh the evidence before him.

---

**6.** The appropriate scope of this court's review in cases involving airport drug courier seizure situations was first set forth in *United States v. Black,* 675 F.2d 129 (7th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1520, 75 L.Ed.2d 945 (1983).

> "Our standard of review is ... limited to inquiry into whether the decision of the district court is clearly erroneous, and requires that particular deference be given to the district judge who had the opportunity to observe the testimony and demeanor of both the officers and the defendant."

*Black,* 675 F.2d at 134 (citing *United States v. Patino,* 649 F.2d 724 (9th Cir.1981)).

The clearly erroneous test of *Black* was reaffirmed in *United States v. Moya,* 704 F.2d 337, 340–41 (7th Cir.1983) (Coffey, J., joined by Cudahy, J.), and *United States v. Seventy-Three Thousand, Two Hundred Seventy-Seven Dollars,* 710 F.2d 283 (7th Cir.1983) (Coffey, J., joined by Pell, J. and Posner, J.). The dissent disregards the established precedent of this circuit and refuses to give deference to the findings of the district court which had the opportunity to hear the testimony and observe the demeanor of the witnesses. Although Judge Cudahy earlier accepted the "clearly erroneous" standard of review in *Moya,* he now chooses to disregard the accepted law of this circuit.

The characteristics of the individual defendants are another factor for the court to consider in determining whether even a facially innocuous encounter might, under the circumstances, have overborne the citizens' freedom to walk away. Here, there is no evidence to even suggest that Holmes and Reyes were either so naive or vulnerable to coercion that special protection from police contacts was required by the Fourth Amendment. *Seventy-Three Thousand, Two Hundred Seventy-Seven Dollars,* 710 F.2d at 289–90.

The third element of this circuit's test to determine whether a police/citizen encounter was voluntary or coerced is the physical setting of the area where the encounter took place. Here, the initial encounter between the officers and the claimants occurred in a public concourse of the airport in the immediate presence of other travelers. The district court specifically determined that "[t]he agents, as in *Mendenhall,* approached the subjects here in a public place, and I find that a reasonable person could have concluded that he or she was free to walk away." Based on the factors first outlined by this court in *Black* and most recently reaffirmed in *Seventy-Three Thousand, Two Hundred Seventy-Seven Dollars,* we affirm the district court's well-reasoned determination and ruling that no seizure occurred during the initial encounter between the officers and the claimants in the public concourse area of O'Hare International Airport and that the claimants were free to walk away at that time.

It is interesting to note that the dissent has chosen to disregard the accepted case law of this circuit concerning the appropriate deference to be given the factual findings of the trial court. It is not the function of the appellate court to "retry issues of fact or substitute its judgment with respect to such issues for that of the trial court." *Aunt Mid, Inc. v. Fjell-Oranje Lines,* 458 F.2d 712, 718 (7th Cir.), *cert. denied,* 409 U.S. 877, 93 S.Ct. 130, 34 L.Ed.2d 131 (1972) (quoting *Cleo Syrup Corp. v. Coca-Cola Co.,* 139 F.2d 416, 417–18 (8th Cir.1943), *cert. denied,* 321 U.S. 781, 64 S.Ct. 638, 88 L.Ed. 1074 (1944)). The dissent, however, chooses to credit the testimony of the claimants and accepts their version of what occurred on the evening in question. The dissent does this although the district court expressly noted:

> "I did observe all of the witnesses in this case, and I made an evaluation based on the backgrounds, motives and the reasonableness of their testimony, in light of all of the other evidence in the case, and in light of my own common sense
>
> \*     \*     \*     \*,     \*     \*
>
> [T]o the extent my findings and conclusions differ from the testimony of Holmes and Reyes, then I chose not to credit their testimony."

By accepting the discredited testimony of the claimants as the proper recitation of the facts herein, the dissent attempts to reach a desired result rather than follow the established precedent of this circuit. *United States v. Black,* 675 F.2d 129 (7th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1520, 75 L.Ed.2d 945 (1983); *United States v. Moya,* 704 F.2d 337, 340–41 (7th Cir.1983); and *United States v. Seventy-Three Thousand, Two Hundred-Seventy-Seven Dollars,* 710 F.2d at 288.[7]

---

7. The dissent recognizes that "when the characteristics [of the drug courier profile] are combined in a suspicious manner, or lead the agents to observe independently suspicious conduct, [then] official intrusion [is] warranted." Dissent at 1103–1104. The dissent then chooses to totally disregard the trial court's finding that "the facts or the circumstances in this case giving rise to suspicion on the part of the agent and officer are even stronger than *Mendenhall.*" Dissent at 1103–1104. Instead of giving due deference to the factual findings of the district court, the dissent asserts that:

"this case is more like *Reid v. Georgia,* 448 U.S. 438 [100 S.Ct. 2752, 65 L.Ed.2d 890] (1980), than *Mendenhall.* In *Reid,* the petitioner appeared to fit the 'drug courier profile.' The *only additional* fact which particularized his conduct was that he preceded his traveling companion from the plane and occasionally looked backward at him as they walked through the airport. The Court held that the agents could not have reasonably suspected the petitioner of criminal activity on the basis of these observed circumstances."

### B.

After the claimants' conversation with Agent Streicher and Officer Burzinski at Gate E–2, the four individuals descended the steps and proceeded to the area below Gate E–2 to inspect the claimants' luggage. The district court found "that the defendants knowingly and voluntarily consented to the searches of the luggage prior to the searches of [it] downstairs" and also that the claimants voluntarily accompanied the officers downstairs in order to identify their luggage. This finding of the district court distinguishes this case from that addressed by the Supreme Court in *Royer.* In *Royer,* the police officers retained the suspect's driver's license and ticket during questioning and the suspect did not give consent to the search of his luggage (which had been removed from the plane without his consent) until he was in a secluded, coercive setting. *Royer,* 103 S.Ct. at 1327. In the case at bar, Reyes and Holmes voluntarily consented to the search of their luggage prior to any detention.

From our review of the record, it is evident that the district court's factual determination that the claimants freely decided to accompany the officers downstairs and allowed them to search their luggage was not clearly erroneous.[8] Holmes and Reyes accompanied the officers downstairs and consented to the searches of their luggage in hope that by "going along" with the officers, their relatively small quantities of marijuana and cocaine would be confiscated and they would be on their way without any further investigation into their activities and had it not been for the discovery of the bulges in Reyes' pants and the bundles of money found during the pat-down search, the appellants would have been released. Reyes and Holmes voluntarily accompanied the officers in a spirit of apparent cooperation.

Upon entering the dimly lit, secluded and narrow corridor area below Gate E–2, Agent Streicher gave Reyes a visual "once-over." The unarmed Streicher observed bulges in Reyes' boots and, according to his own testimony, patted down the claimant's lower leg area "for [his] own safety and protecting [himself]." Agent Streicher "didn't know what was inside [the] pants leg" and upon feeling an unidentified hard object asked Reyes to remove his boots. Reyes responded that he would need some help with the task and Streicher assisted him. As Reyes' boots were removed, bundles of cash fell from his pants legs and boots. Reyes and Holmes were subsequently arrested and a total of over $84,000 was found secreted on their persons and in a suitcase.

■ The claimants challenged Agent Streicher's pat-down search as being unreasonable under the Fourth Amendment. The district court found the search to be

---

Dissent at 1103–1105 (emphasis added).

Whereas in *Reid* there was "only [one] additional fact" other than the usual DEA drug courier profile which attracted the officer's attention, this single fact is in contrast to this case wherein there are several facts present to support the heightened suspicions of Agent Streicher and Officer Burzinski: (1) the claimants milled around the gate area after deplaning, glancing about as if looking for someone or something; (2) the claimants viewed the United Airlines arrival and departure screen for an inordinately long period of time; and (3) the claimants walked slowly through the terminal, glancing over their shoulders several times as if trying to determine whether they were being followed. These three factors convince us, beyond a doubt, that the district court's finding that this case is analogous to *Mendenhall* was proper; in contrast to the dissent's strained reliance on the single factor in *Reid.*

8. The dissent states that "[t]he petitioner could reasonably conclude that their freedom to leave was contingent upon their consent to the search." Dissent at 1103–1104. This finding is mere speculation, at best, and contrary to the finding of the district court. The dissent attempts to buttress its finding by stating that "[t]he district court's determination that this consent was freely given when it was premised on a promise of release from detention is, at the very least, clearly erroneous." Dissent at 1103–1104. No reason is given, however, to explain why the district court's determination is clearly erroneous. Once again, the dissent has chosen to credit the testimony of the claimants although the district court, which had the opportunity to observe first-hand the witnesses, did not credit the claimant's testimony.

lawful on two independent bases, only one of which we will consider herein.[9] For the reasons stated hereafter, we affirm the district court's determination that Agent Streicher was certainly justified in requiring a full search of Reyes for his own safety and that of his partner after observing a bulge and undertaking a pat-down of the top of Reyes' boots (an area where weapons are often secreted) and, thus, the search was not unreasonable and in violation of the defendants' Fourth Amendment rights.

The propriety of a law enforcement officer's protective search was first addressed in the Supreme Court's *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) decision. In *Sibron v. New York,* 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968), the Court stated:

> "In the case of the self-protective search for weapons, [the police officer] must be able to point to particular facts from which he reasonably inferred that the individual was armed and dangerous."

392 U.S. at 64, 88 S.Ct. at 1903.

Our review of Agent Streicher's actions must be guided by the Court's statements in *Terry* which follow:

> "[I]n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion."

392 U.S. at 21, 88 S.Ct. at 1880 (footnote omitted).

> "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger."

392 U.S. at 27, 88 S.Ct. at 1883.

Concurring in *Royer,* Justice Brennan recently noted:

> "*Terry* simply held that under certain carefully defined circumstances a police officer 'is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing ... in an attempt to discover weapons which might be used to assault him.' "

*Royer,* 103 S.Ct. at 1330 (quoting *Terry,* 392 U.S. at 30, 88 S.Ct. at 1884).

In reviewing Agent Streicher's conduct in light of all the testimony before it, the district court concluded:

> "[T]here was a reasonable suspicion, and, in fact, knowledge of criminal activity on the part of both claimants; and a search of the persons at the place made, which was downstairs, for the protection and safety of the agent and officer was justified; and this was particularly true after Agent Streicher said that he saw a bulge in the pants' leg of Mr. Reyes.
>
> "I viewed the cash in this case, and I did see how much room all of that cash was required to take on a person—although it was that one had about some 30-some thousand and one had about 50-some thousand; but in any event, that was a lot of cash, and it is very hard for me to imagine how it would not cause a bulge on the person. Agent Streicher said he saw a bulge, and I credit that testimony."

Our review of the record in the instant case convinces us that the conduct of Agent Streicher in "patting down" Reyes was justified within the law and the district court correctly determined that it was not unreasonable under the Fourth Amendment.

■ The officer's attention was first attracted to the claimants when their appearance and conduct was in conformance with

---

**9.** Judge Kocoras determined that the admissions of Holmes and Reyes that they were in possession of controlled substances provided probable cause for their arrest. Incident to such an arrest, the claimants could have been searched by the officers, according to the court. As we find the searches of Reyes and Holmes to be justified as protective weapons searches, it is unnecessary for us to review the propriety of the district court's determination that the searches were lawful due to the existence of probable cause to arrest the claimants based on their statements.

the DEA-devised drug courier profile.[10] The claimants' furtive and anxious movement through the airport terminal further heightened the officers' suspicions that something unusual was possibly at foot. During the officers' constitutionally permissible encounter with Reyes and Holmes, the claimants were anxious and nervous and only slightly less so after the officers informed them that they (the officers) were not interested in small quantities of contraband. At this time, the officers arranged for the retrieval of the claimants' luggage and United Airlines personnel placed it beneath Gate E–2 in a compact, dark non-public area illuminated only by "Exit" signs. In this secluded, confined area where the search took place Agent Streicher was unarmed and Officer Burzinski's pistol was not readily available as it was contained in an ankle holster under the police officer's jeans. Under the totality of the circumstances, Agent Streicher was legitimately wary of the vulnerable positions the officers would be in if they were to be physically challenged by either of the appellants during the inspection of the luggage. To further heighten Streicher's uneasiness, the DEA agent noticed bulges under the pants of Reyes immediately above his boots.

As noted by the district court, it appears reasonable that the secretion of over $30,000 upon Reyes' person would result in perceptible bulges under his clothing. Under the above-outlined circumstances, we cannot say that the conduct of Agent Streicher in performing the pat-down weapons search of Reyes was unjustified and unreasonable under the Fourth Amendment as construed by the Supreme Court in *Terry* and *Sibron*.

Secluded as he was with Officer Burzinski and the claimants, in a two-on-two situation, it was reasonable for Agent Streicher, unarmed, to fear being confronted and overpowered by the defendants and to take the necessary precaution to visibly and physically ascertain if in fact the suspects were armed. It was not unreasonable for Agent Streicher to suspect that a drug trafficker might be armed. *United States v. Post*, 607 F.2d 847, 851 (9th Cir.1979). Nor was it unreasonable for the agent to suspect that the bulges observed near the top of Reyes' boots might be firearms, as this "was perhaps the most obvious place a weapon would have been concealed." *State v. Long*, 37 N.C.App. 662, 246 S.E.2d 846, 851 (1978). In fact, Officer Burzinski carried a pistol in an ankle holster beneath her pants leg.

We affirm the district court's ruling that the pat-down search of Max Reyes was justified as a "reasonably prudent man in the circumstances would [have been] warranted in the belief that his safety or that of others was in danger." *Terry*, 392 U.S. at 27, 88 S.Ct. at 1883.

C.

The claimants challenge the admissibility of the statements they made to Special Agent Joseph Salvemini following their arrest. The signed statements recited, in pertinent part:

"My name is Donald Holmes .... I went to Ft. Lauderdale on ... the 6th of September 1980. At that time I had approximately $54,000 in cash with me which I intended to use to purchase marijuana....

"When I went to Florida I met with Max E. Reyes and together we attempted to purchase marijuana from four different people .... We were not successful because things are very tight in [F]lorida and no marijuana was available....

"On 9/10/80 Max Reyes and I decided to return to Nebraska because we could not score any drugs. When we got off the plane in Chicago we were stopped by

---

**10.** Although we recognize that the mere fact that an individual fits a drug courier profile is not sufficient to constitute reasonable suspicion for Fourth Amendment purposes, this fact coupled with other suspicious circumstances may provide the reasonable grounds for suspicion required for a reasonable search or seizure. *See United States v. Harrison*, 667 F.2d 1158, 1161 (4th Cir.1982); *Florida v. Royer*, —— U.S. ——, 103 S.Ct. 1319, 1330 n. 2, 75 L.Ed.2d 229 (1983) (Powell, J., concurring). *Accord United States v. Swayne*, 700 F.2d 467, 470 (8th Cir.1983).

two drug officers who asked us to give them permission to examine our luggage and search our persons which we gave. The officers seized a small quantity of marijuana and about 54,000 in cash from me. I have been told that the U.S. Government intends to proceed against the 54,000 and to seize the money because it was intended to be used in a drug transaction. I have also been told that the U.S. Attorney's office has indicated that I will not be prosecuted for the marijuana I had in my possession. I have been advised of my Miranda warnings, my right to remain silent and my right to counsel and to a speedy araignment [sic] before a judge or a magistrate.

"I have decided to foregoe [sic] the aforementioned rights and instead to give this statement to the officers. I have been told by S/A Joseph Salvemini that this statement will not be used against me in any criminal proceeding, however, I have been told that it will be used in a civil forefiture [sic] proceeding against the approximate $54,000 I had in my possession at the time I was detained. . . .

"I have read this statement consisting of two handwritten pages and signed each page and initialed all corrections. This statement is freely and voluntarily given and no promises of reward or threats have been made against me.

/s/ Donald Holmes"

"My name is Max E. Reyes. . . . On [T]hursday September 4, 1980 I traveled to Ft. Lauderdale, Florida with approximately $30,000 in cash which I intended to use to purchase marijuana. . . . When Phil was unable to make the marijuana connection for me I decided to return to Omaha. . . .

"On 9/10/80 I decided to return to Omaha. Upon my arrival in Chicago I was stopped by two narcotic[s] officers who identified themselves as such and requested me to authorize a voluntary search of my person and luggage, which I consented to. The officers seized a small quantity of drugs and a small amount of marijuana from me. I was then advised of my Miranda warnings, my right to remain silent and my right to counsel and to a speedy araignment [sic] before a judge or a magistrate.

"I elected to forgoe [sic] the aforementioned rights and instead to give this statement to the officers. I have been advised by S/A Joseph Salvemini that this statement will not be used against me in any criminal proceeding, however, I have been told that it will be used in a civil forfeiture [sic] proceeding against the proximate $30,000 I had in my possession at the time I was detained.

\* \* \* \* \* \*

While in [F]lorida I only managed to score a small amount of marijuana which was of such poor quality that I decided to return to Omaha without making a large scale purchase.

"I have read this statement consisting of two handwritten pages and signed each page and initialed all corrections. This statement is freely and voluntarily given and no promises of reward or threats have been made against me.

/s/ Max E. Reyes"

It is contended that the highly incriminating statements were improperly obtained by Salvemini via "the ultimate promise; nothing in the statement [would] be used against them." According to the claimants' argument to this court, "[a]lthough they were told that the government would attempt to use the statements in a forfeiture action, the government's attempt to split legal hairs with the distinction between criminal proceedings and civil forfeiture proceedings, is tenuous at best, and certainly not something the average citizen would contemplate or comprehend." Accordingly, the claimants argue, the taking of the statements by Special Agent Salvemini and their subsequent admission at the forfeiture hearing violated the claimants' Fifth Amendment rights.

Responding to a similar challenge at the trial below, the district court found that the claimants had received their Miranda warn-

ings on two different occasions before giving the written statements and "that both claimants knowingly and voluntarily waived those rights." The district court also determined that:

> "The written statements expressly acknowledge the Government's intended use of the statements in civil forfeiture proceedings. There was not any mystery about that, and the statements clearly reflect that."

Based on our review of the record herein, the district court made a thorough and proper inquiry into the voluntariness of the statements by the claimants. The court thoroughly analyzed the testimony of the officers regarding the claimants' *Miranda* rights and determined that no threats, tricks or deception were employed to elicit the statements. *Montes v. Jenkins,* 626 F.2d 584, 590 (7th Cir.1980).

The claimants made their statements to Special Agent Salvemini after being fully advised of the government's intended use of them. The statements signed by the appellants each contained the following statement:

> "I have been advised by S/A Joseph Salvemini that this statement will not be used against me in any criminal proceeding, however, I have been told that it will be used in a civil foreifture [sic] proceeding against the [currency]."

■ Contrary to the claimants' contentions, we do not believe the district court committed error by allowing the admittance of the statements nor was sanctioning the "splitting of legal hairs." The claimants were only promised that the government would not prosecute them criminally and were expressly informed that their statements would be used in the civil forfeiture proceeding the government intended to institute based on the claimants' signed statements that they had attempted and/or intended to purchase controlled substances with the monies. Under the circumstances herein, we hold that the claimants were not duped into cooperating with the govern-

ment in violation of their Fifth Amendment rights, but rather were treated honestly and fairly and received the benefit (no criminal prosecution) that they bargained for.

## II.

Appellants contend the evidence presented to the district court does not mandate the forfeiture of the $84,000 seized from Holmes and Reyes as the language of the forfeiture statute (21 U.S.C. § 881) does not encompass the situation involved herein.[11] The claimants argue that at the time of the seizure of the currency any intent on their part to use the currency to purchase controlled substances had passed and the monies were not properly subject to the forfeiture statute. The district court found that the signed statements of the claimants expressly stated the illegal purpose for which the cash was going to be used and thus the cash was properly subject to forfeiture.

■ The government's burden was only to show probable cause for the forfeiture proceedings, and it surely did so. The burden then shifted to Reyes and Holmes as claimants to show by a preponderance of the evidence that the property was not subject to forfeiture. *United States v. Fleming,* 677 F.2d 602 (7th Cir.1982). Reyes and Holmes had to offer proof that the currency was not "furnished or intended to be furnished ... in exchange for a controlled substance." 21 U.S.C. § 881(a)(6). As the statements given to Special Agent Salvemini were properly determined by the trial court to be admissible, no question exists that the $84,000 in currency was intended to be furnished by Reyes and Holmes in exchange for controlled substances in violation of sub-chapter 1 of Chapter 13 of the United States Code Title XXI. That being the case, there is no question that 21 U.S.C. § 881(a)(6) mandates forfeiture of the currency to the United States.

■ Currency is forfeitable when it is used, or intended or attempted to be used, in violation of the federal controlled sub-

---

11. The claimants expressly acknowledged at oral argument that they are not challenging the

forfeiture statute on constitutional grounds but only as applied to them on the facts herein.

stances laws, although physical seizure of the currency occurs thereafter. *United States v. Kemp,* 690 F.2d 397, 401 (4th Cir.1982); *O'Reilly v. United States,* 486 F.2d 208, 210 (8th Cir.), *cert. denied,* 414 U.S. 996, 94 S.Ct. 546, 38 L.Ed.2d 334 (1973). In effect, the government's interest arises at the time the object is used or generated in violation of the statute, and not at the time of the seizure or at the time of a judgment in the civil forfeiture proceeding. *United States v. Stowell,* 133 U.S. 1, 16, 10 S.Ct. 244, 247, 33 L.Ed. 555 (1890); *Simons v. United States,* 541 F.2d 1351, 1352 (9th Cir.1976). Therefore, we hold the $84,000 seized was subject to forfeiture, pursuant to 21 U.S.C. § 881(a)(6), to the United States when the claimants attempted to purchase a controlled substance in Florida, even though the seizure did not occur until the defendant arrived in Illinois and the district court did not order it forfeited to the United States until several months after its seizure. Accordingly, the district court's decision ordering forfeiture was proper and is AFFIRMED.

CUDAHY, Circuit Judge, concurring.

In my view, the ultimate issue of what constitutes a seizure of the person is a question of law (in effect, of interpretation of the Fourth Amendment), as to which the clearly erroneous standard does not apply. Of course, as to all the various facts surrounding and defining an alleged seizure in a particular case, that standard *does,* in varying degrees, apply. For example, whether a suspect is "free to leave" would appear to have a significant factual component. Similarly, whether a reasonable person in the suspect's place would have believed that he was not free to leave requires a factual analysis. *See United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (Stewart, J.) (with Rehnquist, J., concurring).

Here I agree, that, as a matter of fact and law, under *Mendenhall, Royer, Black* and other controlling precedents, there was no seizure in the public area of the persons of the two claimants.

SWYGERT, Senior Circuit Judge, dissenting.

I respectfully dissent. I cannot agree with the majority that the first seizure took place only after Holmes and Reyes had afforded the agents probable cause to arrest by admitting to carrying controlled substances. In my view a seizure occurred well before there were any articulable grounds for suspicion of criminal conduct.

This court's most recent pronouncements regarding airport drug courier searches and seizures accept Justice Stewart's "reasonable person" test for determining whether a seizure has occurred. *United States v. $73,277,* 710 F.2d 283 at 288 (7th Cir.1983). The "reasonable person" test provides that a person has been seized within the purview of the fourth amendment if, in light of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. *Id.*

Applying this test I find that a seizure occurred in the airport prior to the consent to search the luggage. The agents took the petitioners' airline tickets and driver's licenses. This occurred after the petitioners had checked in for their connecting flight and the last boarding call for the flight had been announced. Their identification was in order. Instead of returning the tickets to the petitioners at that point the officers retained the tickets except for a brief interval when, as the agents testified, Reyes requested permission to return to the gate to attempt to remedy the lack of a baggage claim stub and, accompanied by the agents, was "permitted" to do so. (Testimony of Agent Streicher, Tr. 9, 41.)[1] Petitioners, deprived of their travel documents and perceiving that they could move about the airport only with permission, could reasonably conclude that they were no longer at

---

1. The agents testified that they then reclaimed Reyes' ticket. Tr. at 40. Petitioners' undisputed testimony was that, except for this brief interval, the agents retained both petitioners' tickets throughout the entire encounter. Streicher testified that he did not recall returning the tickets after he and the other officer first viewed them. Tr. at 41.

liberty to be on their way. At the very least, the district court's implicit finding that no seizure occurred at this point is clearly erroneous. *See United States v. Black,* 675 F.2d 129, 134–35 (7th Cir.1982) ("[T]he question [of seizure] is a highly factual one.... Our standard of review is accordingly limited to inquiry into whether the decision of the district court is clearly erroneous.... The determination of precisely when an officer's polite request for an interview rises to the level of a show of authority sufficient to constitute an investigative stop ... may be 'extremely close,' [*Mendenhall,* 446 U.S. at 560 n. 1, 100 S.Ct. at 1880 n. 1 (Powell, J., concurring)].... We are not persuaded that the findings of the district judge on this close question of fact are clearly erroneous."). *But see id.* at 138–39 (Swygert, J., dissenting) ("[T]he majority is incorrect in using the 'clearly erroneous' standard of review. The majority employs this standard of review because it believes that whether the encounter between the police and Black amounted to a seizure is a factual matter.... The factual findings, however, are not in dispute. The only issue is whether these facts constitute a Fourth Amendment seizure. This is a question of law and the standard of review, therefore, is not clearly erroneous. The issue is a legal one and so ... deference is inappropriate.").[2]

My conclusion that the seizure occurred prior to the consent to search the luggage is supported by the fact that the consent was not voluntary. The agents testified that they obtained consent to search petitioners' bags by assurances that Holmes and Reyes would not be arrested or charged if the luggage contained only small quantities of contraband.[3] The only inference to be drawn from that assurance is that the agents would have to inspect the luggage to determine whether the petitioners could be released. The petitioners could reasonably conclude that their freedom to leave was contingent upon their consent to the search. The district court's determination that this consent was freely given when it was premised on a promise of release from detention is, at the very least, clearly erroneous.

Because, under the totality of the circumstances, Holmes and Reyes were seized prior to their admission to carrying drugs, it must be determined if this invasion of petitioners' personal security was justified. A temporary seizure is lawful only if the police have "a reasonable and articulable suspicion that the person seized [was] engaged in criminal activity." *Reid v. Georgia,* 448 U.S. 438, 440, 100 S.Ct. 2752, 2754, 65 L.Ed.2d 890 (1980). *See also Brown v. Texas,* 443 U.S. 47, 51, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1979) (The fourth amendment "assure[s] that an individual's reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of officers in the field."). The reasonableness requirement of the fourth amendment requires that the "scope of the detention must be carefully tailored to its underlying justification." *Florida v. Royer,* —— U.S. ——, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983) (plurality opinion). The court's duty is to "evaluate the reasonableness of a particular ... seizure in light of the particular circumstances." *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968). *See A Model Code of Pre-Arraignment Procedure* commentary at 276–77 (1975).

Among the circumstances that can give rise to reasonable suspicion are the officer's knowledge of the methods used in drug courier activity, characteristics of persons engaged in such illegal practices, the behavior of a suspect who appears to be evading police contact, and the suspect's efforts to

---

**2.** I adhere to the view that the questions concerning seizure and consent are questions of law. See *United States v. Black, id.* at 138–39 (Swygert, J., dissenting).

**3.** Although the agents testified that a consent to search the luggage was given prior to the consent obtained by the agents' promise not to arrest for small quantities of drugs, the district court made no findings concerning this first "consent." Even this alleged first consent was given *after* the seizure occurred.

conceal the truth during a police/citizen encounter. *See United States v. Moya,* 704 F.2d 337, 343 (7th Cir.1983) (citing *United States v. Mendenhall,* 446 U.S. 544, 563, 100 S.Ct. 1870, 1882, 64 L.Ed.2d 497 (1980)). Holmes and Reyes initially drew the officers' attention because they had arrived from Fort Lauderdale, Florida, a city the Drug Enforcement Agency has designated as a source for drug couriers; they were casually dressed and one was untanned—typical elements of a "drug courier profile." However, as the majority recognizes, the mere fact that an individual matches some elements of a drug courier profile is insufficient to constitute reasonable suspicion for fourth amendment purposes. Maj. op. at 1098–1099, n. 7. Only when the characteristics are combined in a suspicious manner, or lead the agents to observe independently suspicious conduct, is official intrusion warranted. *See United States v. Berry,* 670 F.2d 583, 600–01 (5th Cir.1982). *See also Florida v. Royer, supra,* 103 S.Ct. at 1326 (the additional fact that Royer was travelling under an assumed name combined with the facts of paying cash for one-way ticket, checking bags with incomplete identification tags, and nervous conduct, formed the basis for reasonable suspicion).

The record does not support the district court's finding that the circumstances arousing suspicion on the part of the officers here were stronger than in *Mendenhall.* Mendenhall's airline ticket and driver's license bore different names, and Mendenhall explained the discrepancy evasively when agents identified themselves; Mendenhall was so shaken that she had a hard time speaking. *Id.* 446 U.S. at 548, 100 S.Ct. at 1873–74. In contrast, petitioners here were not travelling under assumed names. Their responses to initial questioning showed no evasiveness or attempt to conceal. Their identification documents were all in order. There was no additional basis for suspicion other than a display of anxiety after the officers detained them. Considering that their flight had been called and Reyes had just discovered that his luggage claim check was missing, I find this anxiety unexceptional. It does not

supply, without more, the requisite basis for suspecting petitioners of criminal conduct.

Indeed, this case is more like *Reid v. Georgia,* 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980), than *Mendenhall.* In *Reid* the petitioner appeared to fit the "drug courier profile." The only additional fact which particularized his conduct was that he preceded his traveling companion from the plane and occasionally looked backward at him as they walked through the airport. The Court held that the agents could not have reasonably suspected the petitioner of criminal activity on the basis of these observed circumstances. *Id.* 448 U.S. at 441, 100 S.Ct. at 2754.

In order to be lawful a stop must be proportional to the degree of suspicion prompting the intrusion. When little or no suspicion exists, very little intrusion is tolerable. *See United States v. Berryman,* 706 F.2d 1241 at 1247 (1st Cir.1983). *Brown v. Texas* states this principle of proportionality in the following terms:

> In the absence of any basis for suspecting appellant of misconduct, the balance between the public interest and appellant's right to personal security and privacy tilts in favor of freedom from police interference.... [E]ven assuming that [a strong social] purpose is served to some degree by stopping and demanding identification from an individual without any specific basis for believing he is involved in criminal activity, the guarantees of the fourth amendment do not allow it. When such a stop is not based on objective criteria, the risk of arbitrary and abusive police practices exceeds tolerable limits.

443 U.S. at 52, 99 S.Ct. at 2641.

When the officers stopped Holmes and Reyes, questioned them and took and kept their travel documents, Holmes and Reyes were seized. At that point, the police lacked the knowledge of specific and articulable facts to justify the seizure. Because the search of the petitioners' persons and suitcases that yielded the forfeited money was a direct consequence of the illegal sei-

zure, I would reverse the judgment of the district court.