UNITED STATES of America, Plaintiff,

v.

**$12,900 IN UNITED STATES CURRENCY, Defendant.**

**Albert A. Collins, Claimant.**

**No. IP 91–658–C.**

United States District Court,
S.D. Indiana,
Indianapolis Division.

Oct. 8, 1992.

---

Donna R. Eide, Asst. U.S. Atty., Indianapolis, Ind., for plaintiff.

Dennis L. Thomas, Jr., Thomas & Paino, Indianapolis, Ind., for defendant.

## MEMORANDUM ENTRY ON COMPLAINT OF FORFEITURE

TINDER, District Judge.

This matter came before the court on the complaint of the United States of America (the "Government"), seeking forfeiture of $12,900 seized from the Claimant, Albert Collins, on February 18, 1992.

The trial in this matter was held on September 2, 1992. Collins failed to appear, although his attorney assured the court that Collins was aware of the date, time, and place of the trial. Collins's deposition testimony was offered and admitted in lieu of his live testimony. The court has read Collins's deposition, and has taken it into consideration in rendering its opinion in this action.

After considering the evidence and the law, the court now enters the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1. Harlingen, Texas is located near the U.S.–Mexico border. Harlingen is a major source city for marijuana trafficking. A high incidence of marijuana trafficking occurs between Harlingen, Texas and Indianapolis, Indiana.

2. On February 18, 1991, Detective Matthew Mount, an experienced narcotics agent with the Indianapolis Police Department (IPD)[1] received a call from a ticket agent at the Indianapolis International Airport (the Airport), reporting that a nervous-looking man had just paid cash for a one-way ticket to Harlingen, Texas. The agent further reported that after the man purchased the ticket, he spoke briefly with two Hispanic males, and left the area.[2]

3. In response to this report, Detective Mount and his partner, Detective Ross, met with the ticket agent, and obtained a copy of the individual's itinerary, which listed the flight's departure gate and gave 823–9597 as the "call back" number the individual gave the ticket agent.

4. Mount and Ross waited at the designated departure gate. The ticket agent pointed out the man in question when he appeared to board his flight. Mount and Ross approached the individual, identified themselves as narcotics agents, and asked to speak with him.

5. The individual, who was later identified as Albert Collins, agreed to speak with the detectives. When questioned, Collins indicated that he had been in Indianapolis to attend the funeral of the father of a friend, Robert Arnett, IV.[3]

6. Detective Ross recalled arresting a Robert Arnett at the Airport for bringing in approximately four pounds of marijuana from Harlingen, Texas.

7. Mount asked to see Collins's identification and plane ticket. Collins complied. Upon Mount's request, Collins permitted Mount to search his person.

8. Mount found $12,900 in cash stuffed in Collins's jacket and pants pockets.

9. Collins also had $138 in his wallet, which the detectives subsequently returned to him.

10. Collins had been unemployed for approximately two years, allegedly due to injuries sustained while serving in the Vietnam War.

11. Collins and his wife reported annual gross earnings of approximately $10,000 for several years prior to this incident, all of which was earned by Mrs. Collins as a teacher's aide. Collins and his wife supported three children at that time, including one child who either was in college or was about to enter college.

12. When questioned at the Airport about the $12,900, Collins responded that he had inherited it.

13. When Mount asked Collins why he was carrying so much cash, Collins responded that he had planned to use it to buy used cars in Indianapolis for himself and his son.

14. Mount asked Collins why he came all the way to Indianapolis to buy used cars, instead of buying them in Texas. Collins replied that the salt in the Texas air damaged motor vehicles there, and that he had heard that Indiana was "the place" to buy used vehicles. He could not explain why Indiana vehicles were so desirable despite the damage many sustain from salt used to melt ice on the roads in the winter. Likewise, Collins could not give the detectives the names of any dealerships he visited in Indianapolis.

*United States v. $84,000 U.S. Currency,* 717 F.2d 1090, 1099 (7th Cir.1983).

---

**1.** In February 1991, Mount had approximately three and a half years' experience in narcotics investigation.

**2.** These activities fit into the "drug courier profile" used by law enforcement officials to identify individuals engaged in drug trafficking. *See*

**3.** Collins testified in his deposition that he learned of Robert Arnett's death *after* his arrival in Indianapolis. [Collins Depo. 31]

**1462**

15. The only luggage Collins was travelling with was a carry-on bag. Collins gave the detectives permission to search his bag.

16. The bag contained only underclothing, a pair of bluejeans, and a T-shirt. Collins was wearing the same type of clothing. He could not explain why he was not wearing or carrying clothing typically worn at funerals.

17. Mount advised Collins that he thought the cash was drug money, and that he wanted to have the cash and Collins's bag sniffed by a dog trained to detect drugs. Collins consented.

18. Mount advised Collins that he could stay and observe the procedure (and thereby miss his flight) or he could take a receipt for the cash and leave. Mount indicated that if Collins chose to leave, Mount would wire him the money if the drug test was negative. Collins chose to stay with the money.

19. Mount is a certified Narcotic Drug Detection Dog Handler. He works with an eight-year-old black labrador named Garp. Garp has over six years of drug interdiction experience.

20. Garp is trained to detect the odor of marijuana and cocaine. He is an "aggressive indicator," meaning that when he smells marijuana or cocaine, he attacks whatever the drugs are contained in.

21. During the time Mount has worked with Garp, Garp has reacted positively to drugs approximately 400 times. Garp has been mistaken on only two occasions. On one of those occasions, Garp gave a positive reaction to a bag that did not contain marijuana or cocaine. However, the suspect admitted that he had smoked marijuana while he packed the bag. This may explain why Garp reacted positively to that bag. Mount has no explanation for Garp's other false positive reaction.

22. Mount conducted the drug test in the police office at the Airport. Before bringing in the cash, Mount walked Garp through the room. Garp did not register a positive response to drugs anywhere in the room. Garp was taken out of the room.

Mount then had the cash brought in, and placed it in a new manilla envelope he had gotten from an Airport secretary. He placed the envelope in a file drawer. Mount let the envelope sit in the drawer for 10 to 15 minutes to allow the odor to permeate before bringing Garp into the room.

23. When Mount brought Garp back into the room, Garp gave a positive reaction to the drawer containing the money. That is, Garp scratched at and tried to open that drawer. He did not give a positive reaction to the other drawers. Mount had Garp perform this test two times.

24. Mount also had Garp sniff Collins's bag, and Garp gave a positive reaction. Mount lifted the cardboard bottom of the bag, and found what appeared to be marijuana residue.

25. Based upon Garp's positive reaction to the cash and the bag, and upon Mount's own belief that the bag contained marijuana residue, Mount seized the cash and arrested Collins.

26. Collins was taken to the Marion County Jail lockup. While Collins was confined, the authorities tested the "residue" found in his bag. The next morning, when the test revealed that the "residue" was not marijuana, Collins was released.

27. Shortly after Collins's release, Mount received a call from a Marion County Jail employee. Based on information reported by the jail employee, Mount interviewed Gerald Vandever, Jr., who was in the lockup facing various charges.

28. Vandever told Mount that he had been in the lockup with Collins the night of February 18. According to Vandever, Collins said that he had been arrested for marijuana trafficking, and that the police had seized a substantial amount of money from him.

29. According to Vandever, Collins confided that the money was drug money, but that he told police he had inherited it to avoid forfeiture.

30. Vandever further indicated that Collins tried to recruit Vandever to work in Collins's drug operation. In that regard,

Collins instructed Vandever to call "Chris" on Maple Court in Oaklandon at 823–9597.

31. Mount recognized 823–9597 as the "callback number" Collins gave when he bought his one-way ticket to Harlingen, Texas on February 18. Mount determined that this phone number was registered to Chris Quiroga.

32. The police retained the $12,900 for forfeiture based upon the following evidence that it was drug money: Garp's positive reaction to the money and the bag; Collins's one-way ticket to Harlingen, Texas purchased with cash; Collins's nervous appearance when purchasing the ticket; Collins's discussion with two Hispanic males shortly after purchasing the ticket; Collins's explanation that he came to Indianapolis to attend a funeral when the clothing he wore and carried appeared not to be the type typically worn to a funeral; Collins's bizarre story about Indiana being "the place" to buy used cars, which he told only after the detectives found the cash; and Vandever's report that Collins told him that the seized currency was drug money.

33. A week after Collins's release, the $12,900 was deposited in a bank, and a check in that amount was taken to the Drug Enforcement Administration (DEA) for initiation of forfeiture proceedings. On June 18, 1991, the United States filed its Complaint of Forfeiture in Rem. Collins opposed the forfeiture. The parties conducted pretrial discovery, and the matter proceeded toward trial.

34. On or about April 1, 1992, Mount received a call from Noel Gaertner, a DEA special agent. Gaertner advised that he had learned from the Arkansas DEA that police had arrested a man named James Pickett, who was driving a Dodge van near St. Joseph, Arkansas. The van contained approximately 18 pounds of marijuana. The van was registered to Collins's wife, Guadalupe.

35. Pickett indicated immediately upon arrest that he wanted to cooperate with the police.

36. Pickett informed the police that in late March 1992, a friend named Chris took him to Robert Arnett's house and introduced him to Collins, who was in Indianapolis for a deposition. Chris and Collins recruited Pickett to transport marijuana from Texas to Indianapolis.

37. Chris contacted Pickett several days later, gave him some money, and instructed him to fly to Texas to meet Collins. Pickett then flew to Texas and met with Collins and Candido Delbosque. Pickett agreed that in exchange for Collins's paying him $2,000, he would drive Collins's van containing a shipment of marijuana to Indianapolis for delivery to Robert Arnett. Collins indicated that he and Delbosque would meet him in Indianapolis and would drive the van back to Texas. While Pickett was en route to Indianapolis, he was stopped and arrested in Arkansas.

38. Pickett agreed to drive the van to Indianapolis and meet with Mount and Gaertner and to participate in a "controlled delivery." When Pickett arrived in Indianapolis, he told the officers that he was to deliver the marijuana to Chris Quiroga, rather than to Arnett. He indicated that Quiroga's phone number was 823–9597—the same number that Collins had given to the ticket agent and to Vandever.

39. On April 2, 1992, Pickett called Quiroga, and told Quiroga that he was running late because of problems with the van. Pickett told Quiroga that he was calling from Terre Haute, when in fact he was in Indianapolis.

40. Quiroga indicated that the FBI had been around Arnett's house, and that therefore Quiroga would come up with another place for delivery. Quiroga instructed Pickett to call again for further instructions when he reached Indianapolis. Indeed, Mount recently had been at Arnett's house attempting to serve Arnett with a deposition subpoena in this forfeiture action.

41. Gaertner and Mount obtained some marijuana from the DEA, and packaged it according to Pickett's description of the packaging of the marijuana he was to deliver.

42. When Pickett called Quiroga back, Quiroga's wife instructed Pickett to meet

Quiroga at the Northeastwood Bar at 38th Street and Post Road in Indianapolis. Pickett told the detectives that Quiroga would probably be driving a red and black van.

43. Mount and other officers followed Pickett to the bar. Pickett, who was wearing a "wire," went inside. The officers waited in the parking lot. Subsequently, a red and black van pulled in, with Quiroga driving and Collins riding in the front passenger seat.

44. Quiroga entered the bar, and spoke with Pickett. Quiroga instructed Pickett to follow him to his mother-in-law's house at 12245 McCord Lane in Oaklandon.

45. The officers drove to that location and waited until Pickett's van arrived. Quiroga, Collins, and Delbosque also arrived. Collins admitted that the van Pickett was driving belonged to him, and was registered in his wife Guadalupe's name.

46. Collins's van was a 1990 model which he bought in September 1989. Although it was only about a year-and-a-half old, it had between 85,000 to 90,000 miles on the odometer.

47. The officers arrested Quiroga, Collins, and Delbosque for conspiracy to distribute marijuana. Collins was also charged with possession of cocaine.

48. Collins, or a member of his family, may have received an inheritance. However, Collins's bank records and deposition testimony establish that he made at least the following cash withdrawals from his bank account:

| | |
|---|---|
| January 2, 1991 | $1,200 |
| January 9, 1991 | 6,500 |
| February 6, 1991 | 3,500 |
| Total withdrawn Jan. 2—Feb. 6, 1991 | $11,200 |

49. After these withdrawals, Collins continued to write checks on his account, which resulted in the return of several checks for nonsufficient funds and penalties charged thereon.

50. Collins testified at his deposition that he withdrew these funds and placed them in a safe at his home so he could pay cash for used cars for himself and his son. However, it is implausible that Collins would write bad checks and incur penalties (and perhaps criminal and civil liability as well) if he had a large "stash" of cash at home. It is incredible that Collins, with a family of five living on an annual income of approximately $10,000 for several years, would withdraw these funds and have them sit in a safe at home while he contemplated buying used vehicles.

51. Likewise, Collins's story about flying to Indianapolis to buy used vehicles defies logic and reason, considering that the trip cost approximately $500 when his family of five was living on his wife's $10,-000 annual income. Collins testified that he had no knowledge about any specific cars or dealers in Indianapolis—that he came to Indianapolis because friends had told him that Indiana was a great place to buy used cars. Further, he could not name any dealership he visited while in Indianapolis. He did not test drive any vehicles. Such a frivolous trip is unlikely.

52. To the extent that any conclusion of law stated below constitutes a finding of fact, it is incorporated by reference as an additional finding of fact.

### CONCLUSIONS OF LAW

1. This court has jurisdiction over this civil forfeiture action under 28 U.S.C. §§ 1345 and 1355.

2. 21 U.S.C. § 881(a) provides in pertinent part,

> The following shall be subject to forfeiture to the United States and no property right shall exist in them:
>
> . . . .
>
> (6) All moneys, negotiable instruments, securities, or other things of value furnished or intended to be fur-

nished by any person in exchange for a controlled substance in violation of this subchapter....

3. "Currency is forfeitable when it is used, or intended or attempted to be used, in violation of the federal controlled substances laws, although physical seizure of the currency occurs thereafter." *United States v. $84,000 U.S. Currency*, 717 F.2d 1090, 1101–02 (7th Cir.1983), *cert. denied*, 469 U.S. 836, 105 S.Ct. 131, 83 L.Ed.2d 71 (1984) (citations omitted).

■ 4. The plaintiff in a forfeiture action must first show by a preponderance of the evidence that it had probable cause to institute such action. *Id.*

■ 5. Although less than prima facie proof is sufficient to support a reasonable belief that the property seized is subject to forfeiture, this showing must be supported by more than mere suspicion. *Id.*

■ 6. Further, the Government need not show probable cause until the forfeiture trial. *United States v. Banco Cafetero Panama*, 797 F.2d 1154, 1162 (2nd Cir. 1986). In other words, the Government is entitled to supplement its evidence of probable cause between the filing of the complaint and the forfeiture trial. *United States v. Premises and Real Property at 4496 South Livonia Road, Livonia, New York*, 889 F.2d 1258, 1268 (2nd Cir.1989) ("Once a forfeiture proceeding is brought, if further evidence is legally obtained to justify the government's belief, there is no persuasive reason to bar its use.").

7. The following factors are strong evidence that the seized currency is drug related:

a. A large sum of cash.

b. Evidence that the person carrying the currency was nervous.

c. Evidence that the person carrying the currency was destined for a "source" city for controlled substances.

d. A positive canine alert for the presence of a controlled substance on the seized currency.

*United States v. $215,300 in United States Currency*, 882 F.2d 417, 419 (9th Cir.1989),

*cert. denied, Arboleda v. United States*, 497 U.S. 1005, 110 S.Ct. 3242, 111 L.Ed.2d 752 (1990).

■ 8. Civil forfeiture actions are independent of criminal proceedings. Thus, the Government is not required to show that the claimant was convicted of a crime related to the seized property. Likewise, an acquittal or dismissal of criminal charges does not affect the Government's ability to pursue a civil forfeiture action, even if the civil forfeiture arises from the same activity. *United States v. One Assortment of 89 Firearms*, 465 U.S. 354, 357–66, 104 S.Ct. 1099, 1102–07, 79 L.Ed.2d 361 (1984), *One Lot Emerald Cut Stones and One Ring v. United States*, 409 U.S. 232, 235, 93 S.Ct. 489, 492, 34 L.Ed.2d 438 (1972).

9. Admittedly, Vandever's statement concerning what Collins told him when they were in the lockup together would be inadmissible hearsay in the context of proving Collins's guilt of illegal activity. However, admissibility of such hearsay in the context of a forfeiture trial is another matter. "[P]robable cause depends not upon the admissibility of the evidence upon which the government relies but only upon the legal sufficiency and reliability of the evidence." *United States v. One 56–Foot Motor Yacht Named the Tahuna*, 702 F.2d 1276, 1283 (9th Cir.1983).

10. Further, the statements Collins allegedly made to Vandever constitute an admission against penal interest. "[A] declaration against penal interest meets the reliability test...." *Id.* at 1284.

11. The Seventh Circuit has not explicitly addressed the admissibility of hearsay as the basis for probable cause to initiate forfeiture proceedings. However, several other circuits have held that hearsay may be the basis of probable cause in forfeiture cases. *See e.g., United States v. One 56–Foot Motor Yacht*, 702 F.2d 1276, 1283 (9th Cir.1983); *United States v. One Twin Engine Beech Airplane*, 533 F.2d 1106 (9th Cir.1976); *United States v. One 1975 Mercedes 280S*, 590 F.2d 196 (6th Cir.1978); *Ted's Motors, Inc. v. United States*, 217 F.2d 777 (8th Cir.1954) "[I]nformation of guilt, even though hearsay and incompe-

**1466**

tent with respect to the merits of a case ... may constitute probable cause ... justifying the institution of the [forfeiture] action." *United States v. One 56–Foot Yacht,* 702 F.2d 1276 at 1283 (quoting *Ted's Motors, Inc. v. United States,* 217 F.2d 777, 780 (8th Cir.1954).

12. Additionally, "probable cause may be founded upon hearsay and upon information received from informants...." *Franks v. Delaware,* 438 U.S. 154, 165, 98 S.Ct. 2674, 2681, 57 L.Ed.2d 667 (1978). "The reliability of an informant's tip can be verified by independent corroboration." *One 56–Foot Yacht,* 702 F.2d at 1284.

13. Collins's involvement in the April 2, 1992 incident corroborates Vandever's statement that while in the lockup, Collins attempted to recruit him to work in his drug operation.

■ 14. Independent of Vandever's hearsay statement, the Government established that it had probable cause to believe the seized currency was related to marijuana trafficking, and it was justified in bringing this forfeiture action.

■ 15. After the plaintiff in a forfeiture proceeding establishes probable cause, the burden of proof shifts to the claimant to show by a preponderance of the evidence that the property was not used for the illegal activity alleged. *United States v. $84,000 in U.S. Currency,* 717 F.2d 1090, 1101 (7th Cir.1983).

■ 16. Collins's deposition testimony regarding the source and intended use of the seized currency is not credible. Thus, he failed to show by a preponderance of the evidence that the seized currency is not drug related.

■ 17. Evidence of Collins's involvement in the April 2, 1992 incident is relevant to showing probable cause that the seized currency was drug related. *Cf. United States v. Ramirez,* 894 F.2d 565, 569 (2nd Cir.1990), *United States v. Moschiano,* 695 F.2d 236, 245 (7th Cir.1982) (subsequent similar act admissible to prove defendant's predisposition to commit the crime charged).

18. That the April 2, 1992 incident occurred after the confiscation of the seized currency, rather than before, is irrelevant. "A subsequent act, as well as a prior act, can be used to show intent under Rule 404(b)." *United States v. Ramirez,* 894 F.2d 565 (2nd Cir.1990) quoting *United States v. Hurley,* 755 F.2d 788, 790 (11th Cir.1985).

■ 19. Similar act evidence must be "clear and convincing" before it may be admitted. *See United States v. Moschiano,* 695 F.2d at 245, n. 14 ("[D]irect testimony of the defendant's participation in the other crime is ordinarily held to satisfy this test." (citation omitted). Based upon Detective Mount's direct testimony regarding Collins's April 2, 1992 arrest, the subsequent-act evidence was clear and convincing.

20. The Government has shown by a preponderance of the evidence that probable cause existed to believe that the seized currency was drug related. Collins has failed to show by a preponderance of the evidence that the seized currency is not subject to forfeiture. Therefore, the seized currency is subject to forfeiture to the Government pursuant to 21 U.S.C. § 881(a)(6).

### JUDGMENT OF FORFEITURE

As indicated in the Entry issued contemporaneously herewith, judgment is entered for Plaintiff, the United States of America, and against Claimant, Albert A. Collins.

IT IS NOW ORDERED that the $12,900 which was seized from Albert A. Collins on February 18, 1991 is hereby FORFEITED to the United States of America.

Accordingly, any claim of right, title, or interest by any person is EXTINGUISHED, VOID, and of NO LEGAL EFFECT and is forever FORECLOSED and BARRED.

ALL OF WHICH IS ORDERED.