

# IN THE

# Indiana Supreme Court

Supreme Court Case No. 20S-CR-655

## Michael D. Johnson

*Appellant (Defendant below)*



FILED

Dec 01 2020, 9:46 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

–v–

## State of Indiana

*Appellee (Plaintiff below)*

---

Argued: June 29, 2020 | Decided: December 1, 2020

Appeal from the Madison Circuit Court,
No. 48C01-1602-F5-402
The Honorable Angela G. Warner Sims, Judge

On Petition to Transfer from the Indiana Court of Appeals,
No. 19A-CR-975

---

**Opinion by Justice Massa**

Chief Justice Rush and Justices David and Goff concur.

Justice Slaughter dissents with separate opinion.

**Massa, Justice.**

Michael Johnson offered to sell a substance he called "white girl" to a stranger at Hoosier Park Casino in Anderson. After the solicited patron reported the incident to security, and the account was verified by video surveillance, a Gaming Enforcement Agent led Johnson back to an interview room. Once they entered the room, the agent told Johnson that he would need to pat him down. Upon this pat-down, the agent immediately felt what he deemed a "giant ball" in Johnson's pocket. Consistent with his training, the agent immediately believed this lump was packaged drugs, and after removing the baggie containing white powder from Johnson's pocket, placed him under arrest.

At his trial, the court admitted, over Johnson's objection, the evidence stemming from the pat-down. Because we find that the agent had reasonable suspicion that criminal activity was afoot (so he could stop Johnson), that Johnson could be armed and dangerous (so he could pat Johnson down after entering a confined space), and the lump in Johnson's pocket was immediately apparent as contraband (so it could be seized), we affirm the admission of the evidence because the search and seizure proceeded within the bounds of the Fourth Amendment.

# Facts and Procedural History

After hours of playing quarter slots with a friend at Hoosier Park Casino in Anderson, Brett Eversole was tired and fighting to stay awake on November 8, 2015. Just before he began to doze off, Eversole was approached by a stranger—Michael Johnson, the defendant in this case— who offered to sell him some "white girl." Tr. Vol. 2, pp. 87–89. Believing that this slang referred to cocaine, or less likely in his view a prostitute, and having no interest in either, Eversole rejected Johnson's offer. Rebuffed, Johnson walked away. After consulting with his friend about what "white girl" might mean, Eversole decided to tell security officers that a "man approached me when I was sitting at a slot machine and offered to sell me some drugs, I believe, and he called it white girl." *Id.*, p.92. A security supervisor then sought video surveillance that would

show the encounter and "notified the gaming commission[,] who are law enforcement on the property." *Id.*, p.100.

After viewing the soundless video and conferring with Eversole, Gaming Enforcement Agent Zach Wilkinson—who was a thirteen-year law enforcement veteran specially trained in "issues inside the casino," including "drug trends" and "criminal issues"—quickly located Johnson because the Casino "wasn't super crowded at that moment" and Johnson was easy to identify from Eversole's description and the video's depiction. *Id.*, pp. 103–04, 109. Agent Wilkinson then told him that there had been "a report of him attempting to sell drugs to casino patrons," and Johnson "voluntarily [went] back to the [gaming commission's] interview room." *Id.*, p.111.

After entering the room, Agent Wilkinson informed Johnson that he "needed to pat him down."[1] *Id.* Upon this pat-down, Agent Wilkinson skimmed over a lump that—through his mandated yearly "training for identification of drug[s] by feel or by sight"—felt like a "ball of drugs." *Id.*, pp. 113–14. After Agent Wilkinson removed a baggie filled with "white powder" from Johnson's pocket, he placed him under arrest. *Id.*, p.114. Although this substance appeared to be cocaine, later testing merely revealed it to be sodium bicarbonate, also known as baking soda. The State later charged Johnson with "dealing in a look-a-like-substance," a Level 5 felony under Indiana Code section 35-48-4-4.6. After unsuccessfully moving to suppress the admission of any evidence flowing from the search, a jury convicted Johnson of the charge, and he appealed, renewing his argument under the Fourth Amendment.

The Court of Appeals reversed. While stating that "[i]t is incumbent upon the State to prove that the measures it used to conduct a search and seize evidence were constitutional," the panel also implied that the State must parry every constitutional attack by refuting any claim that

---

[1] Although Johnson's attorney asserted during oral argument that the pat-down occurred outside the room, Agent Wilkinson repeatedly testified that it occurred inside the room. This discrepancy does not impact the outcome.

"suggests alternative scenarios" for how evidence was obtained. *Johnson v. State*, 137 N.E.3d 1038, 1043–44 (Ind. Ct. App. 2019), *reh'g denied, vacated*. Ultimately, even though "Agent Wilkinson would arguably have . . . developed probable cause for an arrest," the court concluded that "the evidence does not dispel concern that the ball of powder retrieved from Johnson's pocket was obtained in violation of his Fourth Amendment right to be free from an unlawful search and seizure." *Id.* at 1044.

The State sought transfer, which we now grant.

## Standard of Review

"The trial court has broad discretion to rule on the admissibility of evidence." *Thomas v. State*, 81 N.E.3d 621, 624 (Ind. 2017) (citation omitted). Ordinarily, we review evidentiary rulings for an abuse of discretion and reverse only when admission is clearly against the logic and effect of the facts and circumstances. *Id.* But when a challenge to an evidentiary ruling is based "on the constitutionality of the search or seizure of evidence, it raises a question of law that we review *de novo*." *Id.*

## Discussion and Decision

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.[2] The Fourth Amendment, then, generally requires warrants for searches and seizures, and any "warrantless search or seizure is per se unreasonable." *Jacobs v. State*, 76 N.E.3d 846, 850 (Ind. 2017) (quotation omitted). "As a deterrent mechanism, evidence obtained in violation of

---

[2] Although Johnson offhandedly mentioned Article 1, Section 11 of our Indiana Constitution, he has waived the assertion for lack of specific argument.

this rule is generally not admissible in a prosecution against the victim of the unlawful search or seizure absent evidence of a recognized exception." *Clark v. State*, 994 N.E.2d 252, 260 (Ind. 2013). While the State can overcome this bar to admission by proving "that an exception to the warrant requirement existed at the time of" a warrantless search, *Bradley v. State*, 54 N.E.3d 996, 999 (Ind. 2016) (quotation omitted), it need not disprove every alternative explanation forwarded by a defendant.

Although the parties and the courts below largely focused on whether there was probable cause to arrest Johnson at the time of the search (potentially bringing the seizure within the search-incident-to-arrest exception to the Fourth Amendment), there is a clearer path to sustaining the evidence's admission: "the encounter was along the lines of a *Terry* stop." Appellant's Br. at 10. To determine, then, whether the evidence here should be suppressed, we must resolve three issues: (1) whether Agent Wilkinson had justification to stop Johnson under *Terry*; (2) whether Agent Wilkinson could perform a *Terry* frisk of Johnson; and (3) whether Agent Wilkinson could seize the baggie felt in Johnson's pocket. Answering yes to each in turn, we hold the evidence admissible.

## I.  Agent Wilkinson was justified in stopping Johnson under *Terry* after watching the video and talking to Eversole.

An officer can stop a person if the officer "observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot." *Terry v. Ohio*, 392 U.S. 1, 30 (1968). While this stop requires less than probable cause, an officer's reasonable suspicion demands more than just a hunch: "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion." *Id.* at 21.

Agent Wilkinson knew that Eversole, a disinterested third-party, informed security officers that Johnson had tried to sell him "white girl," which he believed to be cocaine and believed was offered because the

stimulating effect of the drug could perk him up when he was nearly asleep. *See Adams v. Williams*, 407 U.S. 143, 146 (1972) ("The informant here came forward personally to give information that was immediately verifiable at the scene."). Eversole stayed at the scene, and confirmed this account with Agent Wilkinson, subjecting himself to false informing if he concocted the story. *See Illinois v. Gates*, 462 U.S. 213, 233–34 (1983) ("[I]f an unquestionably honest citizen comes forward with a report of criminal activity—which if fabricated would subject him to criminal liability—we have found rigorous scrutiny of the basis of his knowledge unnecessary."); *Kellems v. State*, 842 N.E.2d 352, 355 (Ind. 2006) ("[T]he prospect of prosecution for making a false report heightens the likelihood of the report's reliability."), *rev'd on reh'g on other grounds*; Ind. Code § 35-44.1-2-3(d) (2015) ("A person who . . . gives a false report of the commission of a crime or gives false information in the official investigation of the commission of a crime, knowing the report or information to be false . . . commits false informing."). Because "informants who come forward voluntarily are ordinarily motivated by good citizenship or a genuine effort to aid law enforcement officers in solving a crime," *Duran v. State*, 930 N.E.2d 10, 17 (Ind. 2010), there is scant reason to doubt the veracity of Eversole's account.

And ensuing police work bolstered the impartial tip. Surveillance video confirmed Eversole's narrative, and the man in the video matched his earlier description of Johnson. *See McGrath v. State*, 95 N.E.3d 522, 528 (Ind. 2018) (holding that an "independent investigation to confirm the street address, the color of the house, the names of the occupants, and the bright light" sufficiently augmented an **anonymous** tip to form **probable cause** that a house was being used to grow marijuana). Relatively few patrons populated the casino, narrowing the field of suspects who could match the specific description and depiction of Johnson. *Abel v. State*, 773 N.E.2d 276, 279 (Ind. 2002) (finding reasonable suspicion supported when suspect "fit the general description of the sought-after person, was in the general area, and it was the early morning hours") (quotation omitted). When "a tip from an identified informant or concerned citizen [is] coupled with some corroborative police investigation," an officer has "reasonable

suspicion for an investigative stop." *Kellems*, 842 N.E.2d at 353. Agent Wilkinson had reasonable suspicion to stop Johnson under *Terry*.

## II. Agent Wilkinson could perform a *Terry* frisk of Johnson after they entered the interview room because it was reasonable to believe he was armed and dangerous.

On appeal, Johnson asserted that even if reasonable suspicion supported a *Terry* **stop**, "the pat down **search** that revealed the substance exceeded the allowable legal scope" because "there was no evidence in the record that would have led officers to believe that Johnson was either armed or dangerous." Appellant's Br. at 11–12 (emphasis added). Not so. After making a *Terry* stop, an officer may, if he has reasonable fear that a suspect is armed and dangerous, frisk the outer clothing of that suspect to try to find weapons. *Terry*, 392 U.S. at 27. The purpose of this protective search "is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence." *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993) (quotation omitted). "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry*, 392 U.S. at 27. To determine whether an officer acted reasonably, we consider the specific, reasonable inferences that the officer, in light of his experience, can draw from the facts. *Id.* Here, the facts supported the reasonableness of the pat-down: Agent Wilkinson suspected Johnson of trying to sell drugs and was about to interview him one-on-one in a small windowless room early in the morning.

"[C]ourts have often considered evidence of drug involvement as part of the totality of the circumstances contributing to an officer's reasonable belief that a subject is armed and dangerous." *Patterson v. State*, 958 N.E.2d 478, 486 (Ind. Ct. App. 2011). While our Court of Appeals has held that evidence of marijuana **use** by a driver may not create a reasonable fear that a suspect is armed, *see Rybolt v. State*, 770 N.E.2d 935, 941 (Ind. Ct.

App. 2002) (holding pat-down unjustified when officer merely believed "that individuals who use narcotics also carry weapons"), *trans. denied*, further evidence of other criminal activity can, *see, e.g., Durstock v. State*, 113 N.E.3d 1272, 1277 (Ind. Ct. App. 2018) (holding pat-down search justified when officers, among other things, believed that a suspect "was involved in drug activity" and other evidence revealed that the situation could be dangerous—a loaded gun was found in an adjacent bathroom the suspect had just left), *trans. denied*. What's more, "the right to frisk is automatic whenever the suspect has been stopped upon the suspicion that he has committed, was committing, or was about to commit a type of crime for which the offender would likely be armed," in that case, a burglary. *N.W. v. State*, 834 N.E.2d 159, 165–66. (Ind. Ct. App. 2005) (cleaned up), *trans. denied.*

Based on the facts of this case, a reasonably prudent officer in Agent Wilkinson's position would believe that his safety was potentially in danger. All information available to Agent Wilkinson suggested that Johnson, unlike the defendant in *Rybolt*, was trying to **sell** drugs—a crime for which Johnson could possibly be armed—to strangers on a casino floor. As the Supreme Court has acknowledged, officers know that it is "common for there to be weapons in the near vicinity of narcotics transactions." *Illinois v. Wardlow*, 528 U.S. 119, 122 (2000); *see also Parker v. State*, 662 N.E.2d 994, 999 (Ind. Ct. App. 1996) ("Based on the informant's tip, he believed that narcotics would be present. . . . [The officer] knew . . . that firearms were frequently present in drug transactions."), *trans. denied*. "[F]irearms are 'tools of the trade.'" *United States v. Gilliard*, 847 F.2d 21, 25 (1st Cir. 1988) (quoting *United States v. Trullo*, 809 F.2d 108, 113 (1st Cir. 1987)); *see also Swanson v. State*, 730 N.E.2d 205, 211 (Ind. Ct. App. 2000) (acknowledging that "it is not uncommon for drug dealers to carry weapons"), *trans. denied*. Agent Wilkinson's suspicion that Johnson attempted to sell drugs—supported by Eversole's statements and surveillance footage—helped justify the pat-down.

Whether a *Terry* stop occurs in a confined space can impact the reasonableness of the subsequent pat-down. *See United States v. Post*, 607 F.2d 847, 852 (9th Cir. 1979). An experienced officer, "enclosed in a small room with a man he reasonably suspects to be a dealer in narcotics, [does

not have to] be certain that a suspect is armed before he can make a limited pat-down for weapons." *Id.* Here, Agent Wilkinson spoke with Johnson alone in the "pretty small" windowless interview room. Tr. Vol. 1, p.77. Given his "close proximity" to Johnson as they were about to discuss the attempted drug sale, it was reasonable for Agent Wilkinson to pat down Johnson. *United States v. $109,179 in U.S. Currency*, 228 F.3d 1080, 1086–87 (9th Cir. 2000); *see also United States v. $84,000 U.S. Currency*, 717 F.2d 1090, 1099 (7th Cir. 1983). The fact that another agent helped escort Johnson to the room and was, presumably, in the area does not make Agent Wilkinson's decision any less reasonable. *See Post*, 607 F.2d at 852 (finding a pat-down reasonable even after "[f]our agents stopped and accompanied [the suspect] to the interview room" when only one agent entered the room with the suspect). The one-on-one nature of the interview also increased the danger for Agent Wilkinson. *See id.; $84,000 U.S. Currency*, 717 F.2d at 1099 (finding a pat-down justifiable when agents were "in a two-on-two situation" in a confined space). In a small confined space, it would have been easy for a suspect to attack Agent Wilkinson. Here, being alone with Johnson—suspected of trying to sell drugs—in the small interview room supports the reasonableness of Agent Wilkinson's pat-down.

Courts also consider "the time of day" to evaluate the reasonableness of a *Terry* frisk. *United States v. Johnson*, 921 F.3d 991, 998 (11th Cir. 2019) (en banc), *cert. denied*, 140 S. Ct. 376. Whether a frisk occurs early in the morning may impact its reasonableness. *See id.* (upholding frisk after considering that police found the suspect after 4:00 A.M.); *Abel*, 773 N.E.2d at 279; *N.W.*, 834 N.E.2d at 166 (a pat-down was justified partially because "it was early in the morning"). Here, the attempted sale took place a little before 7:00 A.M., and Agent Wilkinson first learned of it at 7:15 A.M. Because Agent Wilkinson had limited, if any, knowledge about Johnson's activities earlier that morning and the previous evening, it was reasonable for him to believe Johnson may have been armed and dangerous. Of course, not every act—nor every suspected crime—that occurs at an early hour automatically allows for a pat-down. But here, when combined with the suspected crime of selling drugs and the small interview room, the time furthers the pat-down's reasonableness.

"[T]o pursue his investigation without fear of violence," *Dickerson*, 508 U.S. at 373 (quotation omitted), Agent Wilkinson patted down Johnson after they entered the interview room. Johnson's suspected crime, the small interview room, and the early morning hour all support finding Agent Wilkinson's decision to pat down Johnson was reasonable.

## III. Agent Wilkinson could seize the baggie when he immediately identified the lump as contraband the moment he grazed Johnson's pocket.

Johnson urged that the "pat down exceeded the scope of a pat down [u]nder *Terry*" when Agent "Wilkinson testified that upon feeling the item in Johnson's pocket he knew that it was not a weapon." Appellant's Br. at 11–12. But this argument ignores later Supreme Court development of *Terry*, notably *Dickerson*. "If a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent"—even if that item is not a weapon— "there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons." *Dickerson*, 508 U.S. at 376.

When, for example, an officer performing a pat-down search for weapons "felt a 'tubular object' in [a suspect's] pocket that was 'consistent with being a syringe,'" it could be seized under *Terry* because its "identity was immediately apparent." *Durstock*, 113 N.E.3d at 1278. Contraband was properly seized when officers "testified they immediately recognized [it], based on their experience and training, to be marijuana based on its feel." *Holbert v. State*, 996 N.E.2d 396, 400 (Ind. Ct. App. 2013), *trans. denied*. When an officer during a lawful pat-down "felt an object located in [a suspect's] right front pants pocket, which she immediately recognized as 'narcotics' . . . due to its texture, describing it as 'lumpy' and 'wadded,'" the seizure tracked the Fourth Amendment's strictures. *Patterson*, 958 N.E.2d at 487–88. When, during a weapons frisk, an officer "felt an object, located in [a suspect's] left front pants pocket, which he recognized, based on its packaging, shape, and feel to be rock cocaine," the unlawful nature of the object was again immediately apparent and its seizure permissible.

*Wright v. State*, 766 N.E.2d 1223, 1233–34 (Ind. Ct. App. 2002). When an officer "conducted a pat down search for weapons" and "noticed a hard object" in a suspect's left front shorts pocket, he "immediately determined its incriminating character" as cocaine, justifying its seizure. *Parker*, 662 N.E.2d at 999. And when an officer "determined contemporaneously with his patdown search for weapons that the item in [a suspect's] pocket was marijuana," its seizure was *Terry*-authorized. *Bratcher v. State*, 661 N.E.2d 828, 832 (Ind. Ct. App. 1996).

On the other hand, if an officer must manipulate or further examine an object before its nature as contraband becomes apparent, the search exceeds *Terry*'s scope. *See Dickerson*, 508 U.S. at 378 (holding search unreasonable when "the officer determined that the lump was contraband only after squeezing, sliding and otherwise manipulating the contents of the defendant's pocket—a pocket which the officer already knew contained no weapon") (quotation omitted). In other words, "the reasonable suspicion that gives authority to a *Terry* stop does not, without more, authorize the **examination** of the contents of items carried by the suspicious person." *Berry v. State*, 704 N.E.2d 462, 466 (Ind. 1998) (emphasis added). A seizure violated the Fourth Amendment, for example, when an officer "did not claim that he could detect, from the limited touch, the incriminating nature of the object," but instead just "suspected the object was something illegal[,] . . . 'possibly a weapon.'" *Peele v. State*, 130 N.E.3d 1195, 1200 (Ind. Ct. App. 2019) (quotation omitted). An unlawful seizure occurred when an officer felt and removed a pen cap from a suspect then, "'upon further investigation and looking at it,' he saw a baggie hanging from the pen cap, and based on previous experiences of finding narcotics in baggies in pen caps, he suspected that this baggie contained narcotics." *Clanton v. State*, 977 N.E.2d 1018, 1026 (Ind. Ct. App. 2012). And a seizure exceeded *Terry* when an officer removed a bottle from a suspect's "pocket during a patdown for weapons, but the contraband was detected only after [the officer] shined a light into the bottle and opened it." *Harris v. State*, 878 N.E.2d 534, 539 (Ind. Ct. App. 2007), *trans. denied*.

During the pat-down in the interview room, Agent Wilkinson quickly encountered something that "felt like a giant ball" in Johnson's pocket. Tr.

Vol. 2, p.113. Agent Wilkinson immediately recognized, consistent with his training and knowledge of the situation at hand, all the apparent hallmarks of narcotics packaged for sale: the lump felt "like a ball of drugs." *Id.* Once the contour or mass is at once identified as contraband, as here, "its warrantless seizure [is] justified." *Dickerson*, 508 U.S. at 375–76. Because Agent Wilkinson discerned the lump to be contraband as soon as he felt it without further manipulation, he was justified in seizing the powder-filled baggie from Johnson's pocket. This "patdown search did not run afoul of the Fourth Amendment, and therefore the trial court did not abuse its discretion in admitting evidence obtained as a result." *O'Keefe v. State*, 139 N.E.3d 263, 268 (Ind. Ct. App. 2019).

## Conclusion

Agent Wilkinson lawfully removed the baggie from Johnson's pocket after immediately identifying it as contraband during the reasonable pat-down search. Because this seized evidence was properly admitted under the Fourth Amendment, we need not entertain any alternative explanations that could theoretically foreclose the baggie's admission. We affirm.

Rush, C.J., and David and Goff, JJ., concur.
Slaughter, J., dissents with separate opinion.

ATTORNEYS FOR APPELLANT
Paul J. Podlejski
Law Office of Paul J. Podlejski
Anderson, Indiana

ATTORNEYS FOR APPELLEE
Curtis T. Hill, Jr.
Attorney General of Indiana

Stephen R. Creason
Chief Counsel

Courtney L. Staton
Deputy Attorney General
Indianapolis, Indiana

**Slaughter, J., dissenting.**

The Court holds that the officer's frisk of defendant, Michael Johnson, did not violate the Fourth Amendment. I agree with the Court that this is a close case. But I cannot join the Court's careful analysis and write briefly to explain why.

The issue here is when a law-enforcement officer can search a person's outer clothing for weapons during an investigative stop—commonly known as a *Terry* stop and frisk. In *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court struck a fragile balance between a person's rights under the Fourth Amendment and legitimate law-enforcement needs. Balancing these interests, *Terry* mandates that law enforcement may use a "self-protective search for weapons"—a frisk—only if an officer can "point to particular facts from which he reasonably inferred that the individual was armed and dangerous." *Sibron v. New York*, 392 U.S. 40, 64 (1968).

Under this framework, the Court finds that Johnson's frisk was permissible for three reasons. One, the officer received a tip that Johnson offered to sell "white girl"—a street term for cocaine—to a casino patron. Two, the tip occurred about 7 a.m. Three, the officer was one-on-one with Johnson in a small room. *Ante*, at 7. As the Court recognizes, Johnson's suspected drug activity is the most suggestive that he might be armed and dangerous. *Id.* at 8. But, as the Court also recognizes, this alone is not enough. *Id.* at 7–8; *United States v. Lopez*, 907 F.3d 472, 486 (7th Cir. 2018) ("The authority to frisk is not automatic in a drug investigation.").

Unlike the Court, I do not find that Johnson's suspected drug activity, in combination with the time of the encounter and the fact that the officer was alone in a room with Johnson, gives rise to the crucial inference *Terry* requires. These facts do not suggest that Johnson was armed and dangerous. As to the timing, nothing in the record connects the early morning with any likelihood that Johnson (or any other casino patron) was armed. For instance, there is no evidence that 7 a.m. is a unique time when casino patrons, or even drug dealers in casinos, are more likely to be armed. As to the location, while a weapon may be more dangerous in a small, closed-off space, this location does not suggest that Johnson was armed in the first place. Yet that is the necessary inference. Because

neither the time nor the location gives rise to the inference that Johnson was armed, *Terry*'s critical link is missing, and this protective weapons search was unconstitutional.

Admittedly, this is a fine point on which to disagree. But *Terry* draws an intentionally fine line—one I do not wish to see eroded. After all, a frisk is not merely a "petty indignity . . . [but] a serious intrusion upon the sanctity of the person," and one that can "inflict great indignity and arouse strong resentment." *Terry*, 392 U.S. at 17. Because law enforcement provides a vital service, this intrusion will often be worth the cost. But to protect rights guaranteed under the Fourth Amendment, we must respect *Terry*'s limitation.

For these reasons, I respectfully dissent.